JUDGE CASTEL                                    ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x        JUL 2 5 2022

UNITED STATES OF AMERICA                    SEALED INDICTMENT

    - v. -                    :        22 Cr. _____ (  )

BRIJESH GOEL,                           :

        Defendant.          :    22 CRIM 396

- - - - - - - - - - - - - - - x

The Grand Jury charges:

### Overview of the Insider Trading Scheme

1.    From at least in or about February 2017 through in or about September 2021, BRIJESH GOEL, the defendant, and others, participated in an insider trading scheme in which GOEL misappropriated material, non-public information ("MNPI") about potential takeovers to which he had access through his employment at an investment bank located in New York, New York (the "Investment Bank"), and provided that MNPI to a co-conspirator not charged herein who worked at another investment bank in New York, New York ("CC-1"), which CC-1 used, in whole or in part, to execute securities transactions.

2.    While working at the Investment Bank, BRIJESH GOEL, the defendant, received confidential, internal emails directed to the Investment Bank's Firmwide Capital Committee ("FWCC") that contained detailed information and analysis about potential, non-public mergers-and-acquisitions transactions that the Investment

Bank was considering financing, including transactions where the Investment Bank was acting as a financial adviser to one of the companies. Beginning in or about February 2017, in violation of the duties that he owed to the Investment Bank, GOEL tipped CC-1 with the names of potential target companies from these FWCC emails, typically during in-person meetings. CC-1 then used that MNPI to trade call options, including short-dated, out-of-the-money call options, in brokerage accounts that were in the name of CC-1's close relative. GOEL and CC-1 agreed to split the profits from their trading. This insider trading scheme yielded total illegal profits of approximately $280,000.

3.     Then, between at least in or about May 2022 and in or about June 2022, BRIJESH GOEL, the defendant, sought to obstruct investigations into his insider trading scheme by a Grand Jury in the Southern District of New York and by the U.S. Securities and Exchange Commission ("SEC") by deleting, and causing the deletion of, electronic communications relating to GOEL and CC-1's illegal insider trading scheme.

## Background

### The Defendant and the Investment Bank

4.     At all times relevant to this Indictment, the Investment Bank was a leading global financial institution that delivered a broad range of financial services across investment

banking, securities, investment management, and consumer banking. The Investment Bank was headquartered in New York, New York.

5. Between in or about 2013 and in or about 2021, BRIJESH GOEL, the defendant, worked at the Investment Bank in New York, New York, first as an associate and then as a vice president. When GOEL joined the Investment Bank, he worked in the risk division. In or about 2015, GOEL transferred to the investment banking division, where he was a member of the financing group.

Relevant Target Companies

6. At all times relevant to this Indictment, the following companies were registered under Section 12 of the Securities Exchange Act of 1934 and were required to file reports under Section 15(d) of that Act:

a. Lumos Networks Corp. ("Lumos") was a fiber-based telecommunications provider based in Virginia. Lumos's common stock traded under the symbol "LMOS" on the National Association of Securities Dealers Automated Quotations ("NASDAQ") stock exchange in New York, New York.

b. Patheon N.V. ("Patheon") was a contract development and manufacturing organization serving the pharmaceutical and biopharmaceutical sectors and was based in the Netherlands. Patheon's common stock traded under the symbol "PTHN" on the New York Stock Exchange ("NYSE") in New York, New York.

3

       c.    PharMerica Corp. was a provider of pharmacy services based in Kentucky. PharMerica's common stock traded under the symbol "PMC" on the NYSE.

       d.    Calgon Carbon Corp. ("Calgon Carbon") was a manufacturer of products and provider of services designed to remove contaminants from water and air, and was based in Pennsylvania. Calgon Carbon's common stock traded under the symbol "CCC" on the NYSE.

       e.    Chicago Bridge & Iron N.V. ("Chicago Bridge & Iron") was an engineering, procurement, and construction company, and was based in Texas. Chicago Bridge & Iron's common stock traded under the symbol "CBI" on the NYSE.

       f.    Sprint Corp. ("Sprint") was a wireless telecommunications company based in Kansas. Sprint's common stock traded under the symbol "S" on the NYSE.

       g.    Spirit Airlines, Inc. ("Spirit") was a low-cost airline carrier based in Florida. Spirit's common stock traded under the symbol "SAVE" on the NYSE.

<u>Relevant Acquiring Companies</u>

7.    At all times relevant to this Indictment:

       a.    EQT Partners ("EQT") was an alternative investments firm based in Sweden.

b. Thermo Fisher Scientific Inc. ("Thermo Fisher") was a supplier of scientific instrumentation, reagents, and consumables, and software services, and was based in Massachusetts.

c. KKR & Co. L.P. ("KKR") was an alternative investments firm based in New York.

d. Walgreens Boots Alliance ("Walgreens") was an owner of retail pharmacies based in Illinois.

e. Kuraray Co., Ltd. ("Kuraray") was a manufacturer of chemicals, fibers, and other materials, and was based in Japan.

f. McDermott International, Inc. ("McDermott") was a provider of engineering and construction solutions to the energy industry, and was based in Texas.

g. T-Mobile US, Inc. ("T-Mobile") was a wireless telecommunications company based in Washington.

h. Frontier Group Holdings, Inc. ("Frontier") was a holding company that owned Frontier Airlines, the low-cost airline carrier based in Colorado.

## The Investment Bank's Policies Relating to MNPI and Securities Trading

8. As part of his employment with the Investment Bank, BRIJESH GOEL, the defendant, received annual compliance trainings,

including regarding the Investment Bank's policies and procedures concerning insider trading.

9.     For example, the Investment Bank's policy regarding the safeguarding of confidential Information, dated as of on or December 23, 2016, provided, in part:

> In most jurisdictions, information about the following subjects may, depending on the circumstances, be considered material. Note that information may be considered material even if it relates to contingent, uncertain, or rumored events.
>
> - Potential merger and acquisition activities;
>
> - Potential public offerings or other financings. . . .
>
> Nonpublic information is information that is not available to the public about an entity or its securities. . . .
>
> Inappropriate use or disclosure of any potential material nonpublic information that personnel receive could have serious consequences for personnel and the firm, including disciplinary action or potential civil or criminal liability. Personnel who are aware of potential material nonpublic information about an entity or its securities are subject to the following requirements, regardless of their information barrier status and/or how they received such information:
>
> - Personnel must maintain the confidentiality of any potential material nonpublic information received and may use it only for the business purposes for which it was disclosed;

- Personnel should not disclose the information or reveal that they are aware of it to any person who does not have a valid need-to-know the information; . . .

- Personnel are restricted from transacting, and/or directing others to transact in, the securities of the entity(ies) about which they have potential material nonpublic information . . . for their personal or related accounts.

## GOEL and CC-1 Engage in the Insider Trading Scheme

10.  At all times relevant to this Indictment, BRIJESH GOEL, the defendant, and CC-1 were close friends who lived in New York, New York.  GOEL received emails directed to the Investment Bank's FWCC concerning non-public, transactions that the Investment Bank was considering financing and, at times, was also acting as a financial adviser.  The FWCC emails, which typically contained MNPI belonging to the Investment Bank, were highly confidential and generally contained warnings indicating their confidential nature, directing that they not be distributed outside the Investment Bank, and containing language explicitly cautioning against insider trading.

11.  Rather than keep the FWCC emails and their contents confidential, BRIJESH GOEL, the defendant, entered into an illegal agreement to commit insider trading with CC-1, GOEL's close friend. Between approximately 2017 and approximately 2018, BRIJESH GOEL, the defendant, tipped CC-1 with MNPI from the FWCC emails regarding

multiple takeover transactions. The FWCC emails typically included the names of the acquiring and target companies, as well as detailed analyses about the potential transactions. GOEL typically passed the MNPI he obtained from the FWCC emails to CC-1 in person, such as while playing squash. CC-1 then used that information to place trades in CC-1's close relative's trading accounts, typically through the purchase of call options that would become profitable if the price of the relevant target company increased. In some cases, CC-1's trading yielded profits. For example, GOEL and CC-1 traded based on MNPI that GOEL misappropriated from the Investment Bank concerning, among other things: (a) Lumos Networks Corp.'s ("Lumos") acquisition by EQT Partners ("EQT"); (b) Patheon N.V.'s ("Patheon") acquisition by Thermo Fisher Scientific Inc. ("Thermo Fisher"); (c) PharMerica Corp.'s ("PharMerica") acquisition by KKR & Co. L.P. ("KKR") and Walgreens Boots Alliance ("Walgreens"); (d) Calgon Carbon Corp.'s ("Calgon Carbon") acquisition by Kuraray Co., Ltd. ("Kuraray"); (e) Chicago Bridge & Iron N.V.'s ("Chicago Bridge & Iron") acquisition by McDermott International, Inc. ("McDermott"); (f) Sprint Corp.'s ("Sprint") acquisition by T-Mobile US, Inc. ("T-Mobile"); and (g) Spirit Airlines, Inc.'s ("Spirit") acquisition by Frontier Group Holdings, Inc. ("Frontier").

<u>Insider Trading Based on Lumos Tip</u>

12.    On or about February 12, 2017, at approximately 6:01 p.m., BRIJESH GOEL, the defendant, received an internal email distributed to the Investment Bank's FWCC regarding EQT's potential acquisition of Lumos.  The top of the email said, "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY," and went on to say, in part, "[The Investment Bank] has been invited by EQT Partners ('Sponsor') to provide committed financing for its bid to acquire Lumos . . . for a total consideration of approximately $1 billion."  An attachment to the email, which included extensive analysis and details about the proposed transaction, indicated that commitment letters were expected to be signed the next day, on or about February 13, 2017.  The attachment also included the following warning:

> Please be aware that, to the extent that this memorandum contains material non-public information, the use of this information is restricted by law (including, but not limited to, provisions of the U.S. securities laws) and the Firm's policies.  Inappropriate use or disclosure of this information could have serious consequences for you and the firm, including potential criminal liability.

(the "Insider Trading Warning").

13.    The next day, on or about February 13, 2017, at approximately 1:24 p.m., BRIJESH GOEL, the defendant, sent a text message to CC-1, "Let's play Squash after work."  That evening,

GOEL and CC-1 met to play squash in New York, New York, and GOEL tipped CC-1, suggesting that CC-1 purchase LMOS call options.

14.   The next morning, on or about February 14, 2017, at approximately 10:06 a.m., BRIJESH GOEL, the defendant, sent a text message to CC-1, "Did you book the court?" -- which was GOEL's coded way of asking whether CC-1 had purchased LMOS call options, as they had discussed.

15.   The next day, on or about February 15, 2017, CC-1 put on a "bull call spread"[1] in LMOS options:   (i) purchasing approximately 120 LMOS call options with a strike price of $17.50 and an April 21, 2017 expiration date ("LMOS $17.50 Call Options") for between approximately $0.15 and approximately $0.20 per contract, and (ii) selling short approximately 120 LMOS call options with a strike price of $25 and an April 21, 2017 expiration date ("LMOS $25 Call Options") for between approximately $0.03 and approximately $0.05 per contract.   This trading was done in a brokerage account in the name of CC-1's close relative, to which

---

[1]   A "bull call spread" is an options trading strategy that involves purchasing a call option at a particular strike price and then selling an option in the same equity and with the same expiration date but at a higher strike price.  The premium received by selling the call option with the higher strike price partially offsets the premium the investor paid for buying the call with the lower strike price.  The strategy reduces the upfront cost of the trade, at the cost of capping the investor's profit in the event the price of the stock exceeds the upper strike price.

CC-1 had access ("Brokerage Account 1"). LMOS's price at the close of trading that day was approximately $15.01.

16. Five days later, on or about February 20, 2017, Lumos publicly announced that it had entered into a definitive agreement to be acquired by EQT for approximately $18 per share, an all-cash transaction valued at approximately $950 million. The Investment Bank was the joint lead arranger and joint bookrunner for the financing of the transaction. LMOS's price at the close of trading the next trading day was approximately $17.65.

17. On or about April 10, 2017, CC-1 (i) sold approximately 60 LMOS $17.50 Call Options for approximately $0.34 per contract, and (ii) purchased approximately 60 LMOS $25 Call Options for approximately $0.04 per contract in Brokerage Account 1, realizing profits of approximately $1,080.

18. On or about April 19, 2017, CC-1 (i) sold approximately 60 LMOS $17.50 Call Options for approximately $0.32 per contract, and (ii) purchased approximately 60 LMOS $25 Call Options for approximately $0.02 per contract in Brokerage Account 1, realizing additional profits of approximately $900.

<u>Insider Trading Based on Patheon Tip</u>

19. On or about April 24, 2017, at approximately 6:03 p.m., BRIJESH GOEL, the defendant, received an internal email distributed to the Investment Bank's FWCC regarding Thermo

11

Fisher's potential acquisition of Patheon via a tender offer.  The top of the email said, "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY," and went on to say, in part, "[The Investment Bank] is acting as buyside advisor to Thermo Fisher Scientific (TMO) for the acquisition of Patheon, and in the event that TMO wins the bid, [the Investment Bank] will act as the Sole Lead Arranger and Admin Agent on [an] $8.0 billion bridge loan facility. . . . This transaction has not been publicly announced."  An attachment to the email, which included extensive analysis and details about the proposed transaction, stated, in part, that following "confirmatory due diligence, Thermo Fisher will submit a binding proposal [for Patheon] with announcement of the transaction taking place as early as May 8."  The attachment also contained the Insider Trading Warning.

20.  A few hours later, at approximately 9:25 p.m. on or about April 24, 2017, BRIJESH GOEL, the defendant, sent a text message to CC-1, "Wanna swim tonight? My place." CC-1 suggested, "Tomorrow?"  GOEL responded, "Today.  May be around 10.15?"  CC-1 replied, "Can't come today.  On my way to pick up food . . . Pretty close to your place."  GOEL said, "Let me come down. . . U alone?"

21.  Later that evening, on or about April 24, 2017, GOEL and CC-1 met in person on the street in New York, New York,

and GOEL tipped CC-1, suggesting that CC-1 purchase PTHN call options.

22.   Two days later, on or about April 26, 2017, CC-1 purchased approximately 75 PTHN call options with a strike price of $30 and a May 19, 2017 expiration date ("PTHN Call Options") for approximately $0.32 per contract in Brokerage Account 1. PTHN's price at the close of trading that day was approximately $25.74.  That same day, BRIJESH GOEL, the defendant, texted CC-1, "Did u book the squash court?" -- which was GOEL's coded way of asking whether CC-1 had purchased PTHN call options.

23.   On or about May 4, 2017, CC-1 purchased approximately 20 more PTHN Call Options for approximately $0.20 per contract in Brokerage Account 1.  PTHN's price at the close of trading that day was approximately $26.96.

24.   On or about May 15, 2017, Thermo Fisher and Patheon publicly announced that Thermo Fisher had agreed to acquire Patheon for approximately $35 per share via a tender offer, a transaction valued at approximately $7.2 billion.  The Investment Bank was the financial adviser to Thermo Fisher.  PTHN's price at the close of trading that day was approximately $34.60.

25.   The next day, on or about May 16, 2017, CC-1 sold approximately five PTHN Call Options for approximately $4.60 per

contract in Brokerage Account 1, realizing profits of approximately $2,200.

26. A few days later, on or about May 19, 2017, CC-1 exercised the remaining 90 PTHN Call Options, purchasing approximately 9,000 PTHN shares for approximately $30 per share in Brokerage Account 1.

27. On or about May 24, 2017, CC-1 sold the 9,000 PTHN shares he purchased on or about May 19, 2017 for approximately $33.60 per share in Brokerage Account 1, realizing additional profits of approximately $29,700.

<u>Insider Trading Based on Calgon Carbon Tip</u>

28. On or about September 1, 2017, at approximately 9:26 a.m., BRIJESH GOEL, the defendant, received an internal email directed to the Investment Bank's FWCC regarding Kuraray's potential acquisition of Calgon Carbon. The top of the email said, "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY," and went on to say, in part, "[The Investment Bank] to provide financing commitments for $1.3 billion bridge loan to support KURARAY CO., LTD.'s Tender Offer to acquire Calgon Carbon Corporation ('CCC'). . . . This transaction has not been publicly announced." An attachment to the email, which included extensive analysis and details about the proposed transaction, stated, in part, that Kuraray and Calgon Carbon had "reached a non-binding agreement on

price and are currently in the stage of confirmatory due diligence"; the merger agreement would be signed "around September 21st, 2017 at the earliest"; the assumed acquisition price was $21.50 per share; and the Investment Bank was the "exclusive financial advisor" to Kuraray. The attachment also contained the Insider Trading Warning.

29.   Thirteen minutes later, on or about September 1, 2017, at approximately 9:39 a.m., BRIJESH GOEL, the defendant, sent CC-1 a text message, "What r u doing on The Weeknd?" CC-1 responded that CC-1 was going out of town. GOEL then wrote, "Wanna catch up quickly?" CC-1 said, "Sure."

30.   Later that day, on or about September 1, 2017, GOEL and CC-1 met in person in New York, New York, and GOEL tipped CC-1, suggesting that CC-1 purchase CCC call options.

31.   After Labor Day weekend, on or about September 6, 2017, CC-1 purchased approximately 361 CCC call options with a strike price of $15 and an October 20, 2017 expiration date ("CCC $15 October Call Options") for between approximately $0.35 and approximately $0.40 per contract. This trading was done in another brokerage account in the name of CC-1's close relative, to which CC-1 had access ("Brokerage Account 2"). CCC's price at the close of trading that day was approximately $12.85.

32.   On or about September 11, 2017, CC-1 purchased approximately 29 more CCC $15 October Call Options for approximately $0.45 per contract in Brokerage Account 2.   CCC's price at the close of trading that day was approximately $13.40.

33.   On or about September 19, 2017, CC-1 put on a bull call spread in CCC call options, (i) purchasing approximately 25 CCC call options with a strike price of $15 and a November 17, 2017 expiration date ("CCC $15 November Call Options") for approximately $0.72 per contract, and (ii) selling short approximately 25 CCC call options with a strike price of $20 and a November 17, 2017 expiration date ("CCC $20 November Call Options") for approximately $0.28 per contract in Brokerage Account 2.   CCC's price at the close of trading that day was approximately $13.20.

34.   Two days later, on or about September 21, 2017, before the market opened, Calgon Carbon and Kuraray announced that they had entered into a definitive merger agreement, with Kuraray acquiring Calgon Carbon for $21.50 per share in an all-cash deal valued at approximately $1.3 billion.   The Investment Bank was the exclusive financial adviser to Kuraray.   CCC's price at the close of trading that day was approximately $21.40.

35.   After the market opened that same day, on or about September 21, 2017, CC-1 sold approximately 390 CCC October Call

16

Options for approximately $6.40 per contract in Brokerage Account 2, realizing profits of approximately $233,360.

36.   On or about November 17, 2017, CC-1 exercised approximately 25 CCC $15 November Call Options and assigned the resulting approximately 2,500 CCC shares to cover the short position of approximately 25 CCC $20 November Call Options, realizing additional profits of approximately $11,400.

The Defendant and CC-1 Share Their Insider Trading Profits

37.   In or about August 2021, BRIJESH GOEL, the defendant, and CC-1 discussed dividing up the profits and losses from their illegal insider trading scheme, which had begun in approximately 2017.  To hide the true purpose of the payment, GOEL and CC-1 agreed to describe it as a loan and to send an email documenting the purported "loan."

38.   On or about August 26, 2021, BRIJESH GOEL, the defendant, emailed CC-1, "Can you please extend a $80-$90k loan to me?  I will try and transfer it by end of next year or the year after."

39.   On or about September 30, 2021, CC-1 sent a wire transfer of approximately $85,000 to the bank account of BRIJESH GOEL, the defendant, in New York, New York, which included profits from their insider trading.

## The Defendant's Obstruction of Justice

40.   On   or   about   May   23,   2022,   BRIJESH   GOEL,   the
defendant, met in person with CC-1 in New York, New York.  During
the meeting, GOEL told CC-1, in part, that the Federal Bureau of
Investigation   had   recently   approached   him   and   asked   questions
about insider trading and CC-1.  GOEL told CC-1 that he had deleted
certain of his text messages with CC-1 and suggested that CC-1
should do the same.   GOEL further said that if CC-1 deleted text
messages before CC-1 received a subpoena, that would not be
considered obstruction of justice.

41.   On   or   about   June   3,   2022,   BRIJESH   GOEL,   the
defendant, met in person with CC-1 in New York, New York.  During
the   meeting,   which   CC-1   recorded,   GOEL   and   CC-1   discussed
coordinating   what   information   they   would   provide   to   law
enforcement, with GOEL stating, in part, that the Government "will
try to then break you and me, right?   That you said we will do
this or that. . . . I came to tell you that there should not be
any difference in the story, there are the facts and those facts
that you have, I should also have.  They must be the same.  There
should not be a break in the story."

42.   On   or   about   June   10,   2022,   BRIJESH   GOEL,   the
defendant, met in person with CC-1 in New York, New York.  During
the meeting, which CC-1 recorded, GOEL and CC-1 further discussed

deleting evidence relating to their insider trading scheme, with GOEL stating, in part, "Now I need all the messages from 2017, so I have all the messages . . . so that I have an explanation for every single conversation." When CC-1 responded, "But then, should I delete any messages?" GOEL replied, "Yeah." During this meeting, GOEL and CC-1 looked at text messages between GOEL and CC-1 from 2017 that were on CC-1's cellphone, including text messages about Sprint, and GOEL told CC-1 to delete them, which CC-1 did. GOEL said, "Fuck. . . . This we need to delete. Did we put on any trade? . . . It has to be deleted. I don't even have this chat. . . . have to delete it. . . . Sprint . . . . these three to four messages on Sprint, you have to delete this. Let's discuss how to execute. Where is it? This one." GOEL and CC-1 then continued to search for messages on CC-1's phone. GOEL said, "Up, up. Search it. Yeah, let's delete this. Yeah, do it."

## COUNT ONE
### (Conspiracy to Commit Securities Fraud and Tender Offer Fraud)

### Statutory Allegations

43. The allegations in paragraphs 1 though 42 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

44. From at least in or about February 2017 through in or about September 2021, in the Southern District of New York and

elsewhere, BRIJESH GOEL, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, (a) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) securities fraud, in violation of Title 18, United States Code, Section 1348; and (c) fraud in connection with a tender offer, in violation of Title 15, United States Code, Sections 78n(e) and 78ff, and Title 17, Code of Federal Regulations, Section 240.14e-3.

45. It was a part and an object of the conspiracy that BRIJESH GOEL, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon persons, in
violation of Title 15, United States Code, Sections 78j(b) and
78ff, and Title 17, Code of Federal Regulations, Section 240.10b-
5.

46.   It was a further part and an object of the
conspiracy that BRIJESH GOEL, the defendant, and others known and
unknown, knowingly would and did execute, and attempt to execute,
a scheme and artifice to (a) defraud persons in connection with a
security of an issuer with a class of securities registered under
Section 12 of the Securities Exchange Act of 1934 and that is
required to file reports under Section 15(d) of the Securities
Exchange Act of 1934, and (b) obtain, by means of false and
fraudulent pretenses, representations, and promises, money and
property in connection with the purchase and sale of securities of
an issuer with a class of securities registered under Section 12
of the Securities Exchange Act of 1934 and that is required to
file reports under Section 15(d) of the Securities Exchange Act of
1934, in violation of Title 18, United States Code, Section 1348.

47.   It was a further part and an object of the
conspiracy that BRIJESH GOEL, the defendant, and others known and
unknown, willfully and knowingly, would and did engage in a

21

fraudulent, deceptive, and manipulative act and practice in
connection with a tender offer, in that after an offering person
had taken a substantial step to commence a tender offer, GOEL and
others, while in possession of material information relating to
such tender offer, which information they knew and had reason to
know was non-public and which they knew and had reason to know had
been acquired directly and indirectly from an offering person for
such tender offer, the issuer of securities sought and to be sought
by such tender offer, and an officer, director, partner, and
employee and other person acting on behalf the offering person and
such issuer: (a) purchased and sold and caused to be purchased and
sold, and (b) communicated such material, non-public information
relating to a tender offer to another person under circumstances
in which it was reasonably foreseeable that such communication
would likely result in the purchase and sale of, such securities
and securities convertible into or exchangeable for such
securities and options and rights to obtain and to dispose of such
securities and options and rights, without such information and
its source having been publicly disclosed by press release and
otherwise within a reasonable time prior to such purchase and sale,
in violation of Title 15, United States Code, Sections 78n(e) and
78ff and Title 17, Code of Federal Regulations, Sections 240.14e-
3(a) and 240.14e-3(d).

22

### Overt Acts

48.   In furtherance of the conspiracy and to effect its illegal objects, the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about February 13, 2017, GOEL tipped CC-1 with MNPI regarding the potential acquisition of Lumos by EQT in New York, New York.

b.   On or about April 24, 2017, GOEL tipped CC-1 with MNPI regarding the potential acquisition of Patheon by Thermo Fisher in New York, New York.

c.   In or about May 2017, GOEL tipped CC-1 with MNPI regarding the potential acquisition of PharMerica by KKR and Walgreens in New York, New York.

d.   On or about September 1, 2017, GOEL tipped CC-1 with MNPI regarding the potential acquisition of Calgon Carbon by Kuraray in New York, New York.

e.   On or about September 6, 2017, CC-1 purchased approximately 361 CCC call options in New York, New York.

f.   In or about November 2017, GOEL tipped CC-1 with MNPI regarding the potential acquisition of Chicago Bridge & Iron by McDermott in New York, New York.

g.   In or about April 2018, GOEL tipped CC-1 with MNPI regarding the potential acquisition of Sprint by T-Mobile in New York, New York.

h.   In or about May 2018, GOEL tipped CC-1 with MNPI regarding the potential acquisition of Spirit by Frontier in New York, New York.

i.   On or about September 30, 2021, CC-1 wired approximately $85,000 to GOEL's bank account in New York, New York.

(Title 18, United States Code, Section 371.)

## COUNTS TWO through FOUR
### (Securities Fraud)

The Grand Jury further charges:

49.   The allegations in paragraphs 1 though 42, and 48 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

50.   On or about the dates listed below, in the Southern District of New York and elsewhere, BRIJESH GOEL, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section

24

240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, GOEL misappropriated MNPI from his employer, the Investment Bank, in breach of his duties of trust and confidence to the Investment Bank, and provided that MNPI to CC-1 to use, in whole or in part, to execute the securities transactions listed below:

| Count | Order Dates | Transactions |
|-------|-------------|--------------|
| 2 | February 15, 2017 | Purchase and sale of Lumos (LMOS) call options |
| 3 | April 26, 2017 and May 4, 2017 | Purchase of Patheon (PTHN) call options |
| 4 | September 6, 11, and 19 2017 | Purchase and sale of Calgon Carbon (CCC) call options |

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

## COUNT FIVE
### (Securities Fraud)

The Grand Jury further charges:

51. The allegations in paragraphs 1 though 42, and 48 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

52.   From at least in or about February 2017 through in or about September 2021, in the Southern District of New York and elsewhere, BRIJESH GOEL, the defendant, knowingly executed, and attempted to execute, a scheme and artifice to (a) defraud persons in connection with a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit, GOEL embezzled MNPI from his employer, the Investment Bank, by providing the MNPI to CC-1 to use, in whole or in part, to execute securities transactions.

(Title 18, United States Code, Sections 1348 and 2.)

## COUNT SIX
### (Obstruction of Justice)

The Grand Jury further charges:

53.   The allegations in paragraphs 1 though 42, and 48 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

26

54.    Between at least in or about May 2022 and in or about June 2022, in the Southern District of New York and elsewhere, BRIJESH GOEL, the defendant, knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made false entries in records, documents, and tangible objects with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit, GOEL deleted, and caused the deletion of, electronic communications related to his insider trading scheme with CC-1 in order to obstruct an investigation by a Grand Jury in the Southern District of New York and an investigation by the SEC.

(Title 18, United States Code, Sections 1519 and 2.)

### FORFEITURE ALLEGATIONS

55.    As a result of committing one or more of the offenses alleged in Counts One through Six of this Indictment, BRIJESH GOEL, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

27

## Substitute Assets Provision

56.  If any of the above-described forfeitable property, as a result of any act or omission of BRIJESH GOEL, the defendant:

       a.  cannot be located upon the exercise of due diligence;

       b.  has been transferred or sold to, or deposited with, a third party;

       c.  has been placed beyond the jurisdiction of the court;

       d.  has been substantially diminished in value; or

       e.  has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853;
and Title 28, United States Code, Section 2461.)


FOREPERSON


DAMIAN WILLIAMS
UNITED STATES ATTORNEY

Form No. USA-33s-274 (Ed. 9-25-58)

---

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

---

### UNITED STATES OF AMERICA

- v. -

### BRIJESH GOEL,

Defendant.

---

### SEALED INDICTMENT

22 Cr. ___ ( )

(15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5;
and 18 U.S.C. §§ 2, 371, and 1348.)

---

DAMIAN WILLIAMS
United States Attorney

_FOREPERSON_

7/21/22

Sealed Indictment + Arrest Warrant
filed before OTW on 7/21/22