# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY  10166-0193
Tel 212.351.4000
gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

June 19, 2023

VIA E-MAIL AND ECF

Honorable Kevin P. Castel
United States District Court Judge
United States Courthouse
Daniel Patrick Moynihan
500 Pearl St.
New York, NY 10007-1312

Dear Judge Castel:

On behalf of Brijesh Goel, we respectfully submit this response to the Government's June 17 motion *in limine* seeking permission to cross-examine Mr. Goel regarding five specific subjects.[1]  We object to request one, two, and three; we do *not* object to request four (drug use); and we do not understand request five.

*First*, with respect to the allegation of cheating, we submit that not only should the Government's request be denied but that this Court should strike Mr. Niranjan's statement that Mr. Goel was involved in cheating given what appears to be his prior contradictory statements to the Government on the matter.  The Government sent a broad trial subpoena to the University of Berkeley seeking any evidence that Mr. Goel participated in cheating—there was none, and the Government produced none.  Moreover, we proffer to the Court that Assistant Dean and Executive Director of the Berkeley MFE Program, Linda Kreitzman, told us this weekend by telephone that there was no finding of any cheating by Mr. Goel, that the allegation is ridiculous, that Assistant Dean Kreitzman asked Mr. Goel after he graduated to provide information sessions to prospective students in New York and India, and that the school even flew Mr. Goel to India to conduct information sessions.  Indeed, Assistant Dean Kreitzman, who was the executive director of the MFE program from 2000 through 2021, sent us an email afterward making this clear.  Exhibit 1 (Kreitzman 6/17/2023 Email to Counsel.)  In the email, Assistant Dean Kreitzman states the following:  "Pursuant to your phone call when you asked me today if I had any recollection of Brijesh Goel cheating in the program when he was an MFE student.  My answer is NO and I have found zero email[s] from the MFE Program or myself discussing instances of cheating with Brijesh Goel." Exh. 1.  She further states that she and the Associate Director of Admissions have "actually used Brijesh Goel to help us conduct interviews of prospective applicants after he graduated, and also used his help with information sessions in NY

---

[1] Although the Court stated on Friday that Mr. Goel should submit his response by Tuesday (tomorrow) at noon, we are submitting it earlier.

Abu Dhabi • Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles
Munich • New York • Orange County • Palo Alto • Paris • San Francisco • Singapore • Washington, D.C.

GIBSON DUNN

June 19, 2023
Page 2

and in India.  We flew him twice to India to conduct information sessions as we do with students in the US, Europe, and Asia at times.  There is NO WAY POSSIBLE we would have asked a 'cheater' to do that.  Furthermore, we have used Brijesh Goel's picture and this information below in our information session slides right after he graduated and we did so for a few years after 2013. … We would not have done that if it was known to us (and other students in the class) that Brijesh had cheated." Assistant Dean Kreitzman stated that she is willing to fly to New York to appear before Your Honor to testify that the allegation against Mr. Goel is meritless, and she is also available to speak with the Court by video conference or by telephone.

The Government's allegation relies entirely on the uncorroborated, speculative, and hearsay statements of Akshay Niranjan and appears to contradict what Mr. Niranjan told the Government on March 28, 2023.  The 3500 Material of Mr. Niranjan dated March 28 states in relevant part:  "There was a tax and accounting class at Berkeley. Test. Widespread cheating. *AN let ppl cheat off of him*. *Not BG, b/c BG was sitting elsewhere*. Some students started complaining that people were cheating, so as a result the school tried to identify cheaters. *BG was pulled in with a few other people*. In the end, *the school wasn't able to take action* b/c someone else had made all the same mistakes that didn't sit near him." (3501-80 at 4) (emphasis added).  Based on the 3500 material, Mr. Niranjan admitted to the Government that *he*, not Mr. Goel, participated in the cheating, that Mr. Niranjan has no first-hand knowledge about anything that Mr. Goel did relating to this test, and that Mr. Goel was not found to have done anything wrong.  It was perfectly fair to cross-examine Mr. Niranjan about his admission to the Government that Mr. Niranjan participated in the cheating.  It would be improper and a violation of Rule 608(b)(1) to permit the Government to cross-examine Mr. Goel because there is no "probative evidence" that Mr. Goel participated in any cheating given Mr. Niranjan's statements, given that Berkeley did not produce any evidence of wrongdoing against Mr. Goel in response to the Government's broad trial subpoena to the school, and given that Assistant Dean Kreitzman has informed us in writing this weekend that there was no finding of cheating against Mr. Goel.

*Second*, the Government's allegation based entirely on Mr. Niranjan's allegations that Mr. Goel and a Goldman Sachs partner participated in the "deletion of WhatsApp messages ahead of potential civil litigation" is not probative of any actual wrongdoing.  These are uncorroborated and unsubstantiated allegations.  Goldman Sachs has clearly cooperated in every respect with the Government's investigation.  Indeed, one could say that Goldman Sachs has represented the very best of how a company should respond to a Government inquiry given the extent of the time and resources Goldman Sachs made available to respond to all Government questions and requests, and that two senior employees of Goldman Sachs testified during the trial.  The Government has not provided any corroborating evidence of any kind from Goldman Sachs that Mr. Niranjan's very serious allegation of wrongdoing against a Goldman Sachs partner (and Mr. Goel) is true.  Before the Government makes a public allegation of wrongdoing against a Goldman Sachs partner and Mr. Goel on the say-so of Mr. Niranjan, the Government should actually make an inquiry of Goldman Sachs, find out whether there is any corroboration for the fact that there was a civil litigation hold or other obligation that Mr. Goel and the Goldman Sachs partner preserve documents, find out the name of the matter, find out whether

**GIBSON DUNN**

June 19, 2023
Page 3

there was actual threatened litigation, and find out whether there was actual deletion of WhatsApp messages by Mr. Goel and a Goldman Sachs partner. To date, it appears that the Government has done none of these things.

*Third*, conspicuously absent from the Government's submission concerning Mr. Niranjan's allegation that Mr. Goel made certain statements about his relationship with a woman is the 3500 material of the Government's discussion with the woman's attorney. *See* Exhibit 2, 3509-004 (with redactions of the name). The 3500 material of the woman's attorney, along with the contemporaneous financial evidence, reflects that there is no connection whatsoever between the alleged insider trading and any payments to the woman. Once again, the Government relies on the say-so of Mr. Niranjan in the absence of any corroboration, and in the face of contrary evidence. The woman's attorney expressly told the Government in relevant part: (1) "Goel did not talk to [woman] about money problems. Goel did remark, from time to time, about how particular things were expensive. For example, Goel remarked, in substance, that a car was expensive to maintain. Some time ago, Goel was doing repairs on a house. Goel said, in substance, that the repairs were expensive. [Woman] did not recall when that comment was, but didn't think it was 2021"; (2) "Goel sometimes picked up dinners for her. Sometimes she paid. Sometimes they split the bills"; (3) "[Woman] does not recall the approximately $4,000 venmo transfer precisely. But she has an educated guess: She had been telling Goel that she was moving apartments and that it was expensive. This was around a time when Goel talked about leaving his wife for [Woman] but had not done so. She thinks that Goel was feeling guilty and sent the money because she had been talking about the costs of moving. She didn't want his pity and sent it back."; (4) "Around the time she turned 30, [woman] recalls receiving a gift of approximately $1,000 from Goel. Around 2018." Exhibit 2. Moreover, the contemporaneous evidence reflects that Mr. Goel sent a $4,000 venmo transfer in 2021 to this woman, and she sent it back approximately one week later. The Government must know that evidence. There is no connection between the money that Mr. Goel received from Mr. Niranjan in 2021 and this woman's finances. Accordingly, there is no probative value to this evidence of the relationship.

Further, this Court should not permit the Government to cross-examine regarding this alleged affair given the Rule 403 balancing test applied on the Government's motion to exclude the following during Mr. Niranjan's cross-examination—especially where the defense was relying on contemporaneous written statements and the Government's is relying on the say-so of one individual for its proposed testimony: (1) Mr. Niranjan's use of multiple prostitutes while he was engaged and then after being married, which we had argued was interconnected with Mr. Niranjan's troubled, spiraling out-of-control life inextricably intertwined with his theft of inside information from Mr. Goel and his false allegations against him—there is no material difference between the exclusion of this evidence relating to Mr. Niranjan (pursuant to the Government's motion), and the alleged affair; (2) Mr. Niranjan's resistance to contributing any money to Mr. Goel's charitable cause and eventual contribution after repeated requests from Mr. Goel in the face of Mr. Niranjan's allegation that he and Mr. Goel earned approximately $240,000 based on an illegal tip from Mr. Goel in the weeks before (even with the proposed offer to omit the "charitable" aspect to show how it made no sense for Mr. Niranjan to refuse to contribute to a

# GIBSON DUNN

June 19, 2023
Page 4

cause at the request of an alleged tipper of insider information with whom one allegedly made over $240,000 in the weeks before) (*see* Exhibit 3, DX 9-27-2017); (3) Mr. Goel's contemporaneous written statements to Mr. Niranjan on May 1, 2020, that that an insider trading settlement relating to a high profile individual was problematic (*see* Exhibit 4, DX-5/1/2020, "Hmm doesn't seem to be a popular guy, charged of insider trading?"), in contrast to Mr. Niranjan's statements in return to Mr. Goel that this insider trading misconduct was common among hedge funds and was the reason why people paid high fees to hedge funds (Exhibit 5, DX-12/16/2020: "Essentially back in the day, HFs were all doing it and people who allocated to HFs must have been paying that steep fees for that privilege"), thereby minimizing the significance of insider trading; and (4) Mr. Niranjan's statements to Mr. Goel on December 16, 2020 stating that he would only open a trading account in someone else's name if the person were "spouse/parents"—evidence directly showing that Mr. Niranjan did not tell Mr. Goel that Mr. Niranjan had been trading in his younger brother Akshat's trading accounts for years (Exhibit 6 stating the following in relevant part:  at 8:36 am asking "[w]hy not open an a/c in N's name?", Mr. Goel responding "Nah" "Can't", Mr. Niranjan responding "Sis"; at 8:38 am Mr. Goel responding "Lol" "I mean" "Nah" "Too close"; and at 8:49 am Mr. Niranjan stating "There's no relation close enough to borrow and invest except perhaps spouse/parents" "Which can get tenuous"; and at 8:51 am Mr. Niranjan stating that he could invest in an account in a family name but they do not have money to do so: "Well I could do with mine but they don't have money to throw" and Mr. Goel responding "Ya").

*Fourth*, we do not object to the Government's cross-examination of "history of drug use with Mr. [Akshay] Niranjan."[2]

*Fifth*, we do not understand the Government's objection.  Mr. Goel participated in the June 5 and June 10 recordings.  He made statements in Hindi (and English), and he should be able to testify about what statements he made and what he meant.  Mr. Goel should also be able to testify about his understanding of what Mr. Niranjan said in Hindi (and English).  Given that the Government seemed to elicit the same kind of testimony from Mr. Niranjan, the Government's request is odd.  Moreover, the Government's citation to the unpublished decision of *United States v. Richards*, 48 Fed. App'x 353, 355-56 (2d Cir. 2002), has nothing to do with whether a defendant/participant in a recorded conversation can or cannot testify about whether there are inaccuracies in what an expert has included in a transcript.  In that case, the defendant appealed the admission of transcripts of wiretapped conversations by a Jamaican patois expert. The defendant "identifie[d] no inaccuracies in the transcript" and "argue[d] that the expert witness did not base the translation on a sound methodology" "because Jamaican patois is a phonetic dialect".  *Id*.

---

[2] We are reading the Government's request to "permit the Government to examine the defendant about his drug use with Akshat Niranjan" as referring to "Akshay", not "Akshat" Niranjan.

# GIBSON DUNN

June 19, 2023
Page 5

Sincerely,

GIBSON, DUNN & CRUTCHER LLP

/s/ Reed Brodsky

FORD O'BRIEN LANDY LLP

/s/ Adam Ford
/s/ Anjula Prasad

cc:
Joshua Naftalis
Samuel Rothschild
Andrew Thomas