N6CQGOE1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                         22 CR 396(PKC)

 5                                         Trial

 6   BRIJESH GOEL
                  Defendant.
 7
     ------------------------------x
 8
                                           New York, N.Y.
 9                                         June 12, 2023
                                           9:35 a.m.
10   Before:
                     HON. P. KEVIN CASTEL,
11
                                           District Judge
12                                         – and a jury –
                          APPEARANCES
13
     DAMIAN WILLIAMS,
14        United States Attorney for the
          Southern District of New York
15   BY:  JOSHUA A. NAFTALIS
          SAMUEL P.  ROTHSCHILD
16        ANDREW M. THOMAS
          Assistant United States Attorneys
17
     FORD O'BRIEN LANDY LLP
18        Attorneys for Defendant
     BY:  ADAM C. FORD
19        ANJULA PRASAD
          NICOLETTE BEUTHER
20   –and–
     GIBSON, DUNN & CRUTCHER, LLP
21        Attorney for Defendant
     BY:  REED M. BRODSKY
22

23   Also Present:  MATTHEW MAHAFFEY, FBI
                    MADELINE SONDERBY, Paralegal Specialist (USAO)
24

25
```

N6CQGOE1

1           (In open court; case called)

2           DEPUTY CLERK:  For the government.

3           MR. NAFTALIS:  Good morning, your Honor.  Joshua

4    Naftalis, Sam Rothschild, and Andrew Thomas for the government.

5           THE COURT:  Good morning to you all.

6           DEPUTY CLERK:  For the defendant.

7           MR. FORD:  Good morning, your Honor.  Adam Ford,

8    Anjula Prasad, Reed Brodsky, and Nicolette Beuther on behalf of

9    Mr. Goel.

10          THE COURT:  Good morning to you all.

11          MS. PRASAD:  Good morning, Judge.

12          THE COURT:  First order of business is I wanted to

13   address the medical records which I have reviewed, and will

14   say, first off, they cover a period of visits from December 20,

15   2021 to February 2, 2023.  And in July of 2022, the treating

16   psychiatrist stated that the individual has a diagnosis of

17   bipolar disorder NOS and cannabis use disorder in remission.

18          NOS is a well-known abbreviation for "not otherwise

19   specified" and which is consistent with the records which

20   refers to it as unspecified.

21          In the course of treatment, the doctor's notes

22   indicate, and, in context, one would assume that it came from

23   the patient.  It says, literally says, "Taking openly" but I

24   take that to mean "talking openly about insider trading and

25   this investigation is causing him stress, and that the patient

1    reports a friend who he looked up to as a mentor gave him

2    information several years ago.  He reports he was "-- it says

3    "NW," I take that possibly" "new to finance and the information

4    was non-specific."

5              That concludes what I covered from the records which

6    appeared to me potentially of use to the defense and not

7    otherwise invasive of the witness's right to confidentiality

8    surrounding medical records.  So that concludes that issue.

9              Now, with regard to the correspondence of recent days,

10   I want to understand a few things about the chronology here

11   with regard to when it was that the government -- and I know

12   there's a chronology that was furnished by the defense.  I've

13   seen it, but I want to hear from the government what was the

14   chronology on its efforts to secure a stipulation with regard

15   to the text messages of Mr. Niranjan, specifically the review

16   of his phone on June 2, 2022, and then the second review of his

17   phone on June 10, 2022 after the purported events in a

18   stairwell.

19             So what happened?  How did you go about seeking to

20   authenticate this or raise the issue of authentication or raise

21   the issue of a stipulation?  Give me the rundown on that, and

22   I'm going to ask the defense whether they agree with that

23   chronology.

24             MR. ROTHSCHILD:  Yes, your Honor.

25             So on May 28 of this year, we sent for the defense's

N6CQGOE1

1    consideration a proposed stipulation as to, among other things,

2    the authenticity of particular WhatsApp messages between

3    Mr. Niranjan and the defendant that we wished to offer into

4    evidence at trial marked as Government Exhibits 200 through

5    207.  All of those ultimately derived from Government Exhibit

6    253, which has been the subject of the recent papers.  Those

7    are messages, your Honor, that we intend to use affirmatively.

8    They are not messages that were deleted.

9              THE COURT:  All right.  A question about that is, I

10   read, and I think we've had this discussion about this subject

11   before, that there was some offer by the government as to when

12   it was going to disclose witnesses and exhibits.  I don't think

13   I ordered that, but I think the government volunteered that.

14   Is that accurate and when was that by?

15             MR. ROTHSCHILD:  So our exhibits were due on May 31.

16   So we furnished this proposed stipulation before the exhibit

17   list.

18             THE COURT:  Was there an understanding to disclose

19   witnesses?

20             MR. ROTHSCHILD:  Yes, your Honor.

21             THE COURT:  By when?

22             MR. ROTHSCHILD:  Our witness list was due, I believe

23   May 12, your Honor.

24             THE COURT:  So let's take it back to May 12.  How were

25   you going to get these text messages into evidence?

N6CQGOE1

1          MR. ROTHSCHILD:  Your Honor, I think the answer to

2     your question is that in retrospect, we ought to have put

3     somebody on our witness list with respect to this topic.  What

4     I will say is we did not know the name of the individual or

5     individuals --

6          THE COURT:  No, I'm okay with that.  You didn't know

7     Tappeto at that point or Tappeto, is that it?

8          MR. ROTHSCHILD:  That's correct, your Honor.  We

9     didn't know which vendor the cooperator had used.

10          THE COURT:  In that sense it makes it a little bit

11     more puzzling; not less puzzling, but more puzzling.  But okay.

12          And you had disclosed the June 2 output and the

13     June 10 output at a much earlier point.  When was that?

14          MR. ROTHSCHILD:  In August 2022 in our initial

15     production of discovery.

16          THE COURT:  And as I understand it -- and I'm just

17     doing the first overview yet.  I don't want you to argue the

18     point.  But I understand that the argument has been raised by

19     the defendant that this is in the nature of expert testimony

20     and expert disclosure need to have been made.

21          You were of the position that it is fact testimony,

22     and not expert testimony, and no expert disclosure needed to be

23     made, correct?

24          MR. ROTHSCHILD:  That's correct, your Honor.

25          THE COURT:  All right.  So the issues that I think I'm

N6CQGOE1

1   called upon to decide -- and I'm going to ask the defense to go

2   over this territory; we will take a time out just to see if the

3   judge has this framed correctly -- but the issues I'm being

4   asked to decide are whether you can, may, whether you have

5   leave to belatedly designate the witness and whether the

6   witness is expert or lay.

7           Now, maybe you could take those questions in reverse

8   order.  Is the witness expert or lay, and can you belatedly

9   designate, and that probably makes more sense because the

10  standard would be different for an expert than it would be for

11  a lay person.

12          Are those the issues that I am -- and then, of course,

13  we have the subpoena issue.  And on the subpoena issue, this is

14  my takeaway from my reading yesterday, and at various hours I

15  think three letters came in yesterday, but my understanding is

16  the government took the position that the subpoena directed to

17  Tappeto and his company called for production of a broad

18  universe of text messages, including family messages, things

19  that under no sense or no threat could be relevant to this

20  case.

21          And the defense came back and said, not so.  We are

22  not seeking text messages.  We are seeking instructions given

23  to Tappeto, and we are seeking any reports or analyses done by

24  Tappeto or his firm or maybe given to Tappeto and his firm by

25  somebody else.

N6CQGOE1

1          And then I think the next thing I read, if I have this
2    correctly, is that the government was saying, oh, we did not
3    quite understand that.  Nobody is at fault here.  This is
4    happening at lightening speed.  We didn't understand that, and
5    that we may be able to work out any issue relating to the scope
6    of the subpoena.  That's the bid and the ask as I remember it
7    on the subpoena issue.

8          Am I leaving something material out of that
9    chronology?

10          MR. ROTHSCHILD:  No, your Honor.  I'm not sure it was
11   so much that the government didn't understand what the subpoena
12   was requesting.  I think here the phrase "report," which they
13   asked for the June 2 report, the June 10 report, is a term of
14   art that in fact means the content of the report.

15          THE COURT:  So, again, this is neutral of any
16   criticism here.  It's just you maybe, quite reasonably, thought
17   it included the text, and it was clarified that it didn't
18   include the text.  Is that about right?

19          MR. ROTHSCHILD:  Fair enough, your Honor.

20          THE COURT:  And have you come to some understanding on
21   the scope of the Rule 17 subpoena?

22          MR. ROTHSCHILD:  The parties have not conferred on
23   that.

24          THE COURT:  So now let me turn to the defense, and so
25   far we are not arguing the issues.  We're arguing the framing

N6CQGOE1

1    of the issues.  Go ahead, Mr. Brodsky.

2              MR. BRODSKY:  Your Honor, I would add to the framing

3    of the issues that the stipulation that we focused on was

4    provided to us, and it's Exhibit 1 to our June 8 letter, and it

5    does not ask for authenticity of any particular text messages,

6    but rather states that they're asking us to stipulate that a

7    consultant on June 2 extracted data from Mr. Niranjan's

8    cellphone, then a consultant extracted data on June 10, and

9    then marked a marked Exhibit 216 which they called a

10   discrepancy report.  And that --

11             THE COURT:  The discrepancy report is now off the

12   table.  The government isn't going to offer, right?

13             MR. BRODSKY:  They replaced the discrepancy report

14   with the same thing except now what they did, Mr. Tappeto,

15   apparently will take the discrepancy report, they will focus on

16   the first 13 messages which they care about, which we wrote

17   that that's what they cared about.

18             It appears to be that they eliminated other messages,

19   and it's still fundamentally the same thing.  It is a

20   comparison.  So what I would say to it, it's not about

21   authenticity of text messages.  It is rather about the use of a

22   particular technology and about the comparison.

23             THE COURT:  Let me pause.  I'm going to ask a

24   question, and I'm going to let you finish, Mr. Brodsky.  So

25   when I interrupt, hold your thought and get back to it.

N6CQGOE1

1          But when I sit here reading this, I understand there's

2     such a thing as, I don't know if it's pronounced Cellebrite or

3     Cellebrite, however it's pronounced.  It's a piece of software,

4     and it's commonly used.

5          But here is the question I have:  If you had time and

6     paralegal muscle, could not one look at what was on the phone

7     on June 2 and then look at what was on the phone on June 10 and

8     say the following text messages were not there on June 10 that

9     were there on June 2?

10          MR. BRODSKY:  The only person who can do that today is

11     at TransPerfect.  The defense cannot do it even though we have

12     two exhibits which contain over 80,000 messages, and even if I

13     had the 40 or so summer associates at Gibson Dunn working

14     overtime --

15          THE COURT:  Because you don't have the phones.

16          MR. BRODSKY:  Because we're told the technology

17     doesn't -- you cannot compare the two without having the

18     metadata and without knowing where the file system was.  So,

19     for example --

20          THE COURT:  Okay.

21          MR. BRODSKY:  So that's what we're told because we

22     don't have the phones.

23          THE COURT:  All right.  Okay.  Mr. Brodsky, could I

24     impose on you to just let me let the government respond on that

25     simple point?

N6CQGOE1

1         Could not a team of paralegals with the two phones --
2    you can stay at the podium -- with the two phones in front of
3    them simply do a comparison?

4         MR. ROTHSCHILD:  So, your Honor, yes -- the answer is
5    yes, a comparison of the two --

6         THE COURT:  June 2 versus June 10.

7         MR. ROTHSCHILD:  Correct, your Honor.  The
8    spreadsheets that were produced back in August of 2022, those
9    can absolutely be compared.  And I was rising, your Honor, just
10   to note two -- I know we're just getting the facts straight
11   here.  I know we're not arguing.

12        The stipulation Mr. Brodsky refers to is a different
13   stipulation than the one I was referring to.  It was sent the
14   next day, and Mr. Brodsky is correct it's reflected in the
15   discrepancy report, and your Honor is quite right, that's off
16   the table.  But I wanted to note we are not intending to call
17   Mr. Tappeto to offer any testimony about comparison about what
18   was on the phone on June 2 and what was on the phone on
19   June 10.

20        THE COURT:  Oh, then I'm lost.  So what --

21        MR. ROTHSCHILD:  Your Honor, we anticipate Mr. Tappeto
22   to testify about collecting data from the phone on June 2,
23   producing a report of messages on June 2.  We are going to ask
24   him to take Government Exhibit 253, which is what was produced
25   to us by Morvillo and what we produced to the defense in

1    discovery, and to confirm that Government Exhibit 253 comes

2    from or is data that's in his June 2 report that he made of the

3    phone.

4            And we intend to do the same thing with Government

5    Exhibit 254 and say that that data is a subset of data from the

6    June 10 report that he created.

7            We will then call an agent from the FBI --

8            THE COURT:  Okay.  And the agent does the comparison.

9            MR. ROTHSCHILD:  Correct, your Honor.

10            THE COURT:  Thank you.

11            Go ahead, Mr. Brodsky.

12            MR. BRODSKY:  Yes, your Honor.  Respectfully, I

13    compliment the ingenuity and the creativity, but it doesn't get

14    around the fundamental problem of what the government has put

15    themselves in the position after outsourcing.

16            So just to frame the issues, I agree, your Honor --

17    and we're happy to argue the issues -- but whether or not there

18    was a belated designation I think has been stipulated.  Whether

19    it's expert or lay I think is in dispute, and I think there is

20    a question about that.

21            I would an add to that, even if whether they're expert

22    or lay, the third issue would be the sword-shield issue.  Can

23    you call somebody who extracted data, whether they're expert or

24    lay, on one date using the Cellebrite technology of a

25    particular method.

N6CQGOE1

1           There are multiple methods to do it.  And can you do

2      it on June 10, and then call that person but shield them from

3      answering questions about what instructions they received, what

4      reports they ran, what statements Mr. Niranjan made or what

5      counsel made on his behalf, what they advocated or didn't

6      advocate for him.

7           THE COURT:  Well, that in my mind -- and this is where

8      framing is the right way to be discussing this.  In my mind,

9      that's a subpoena issue.  You want to know what did the

10     Morvillo firm tell Tappeto, what were his instructions, what

11     limitations, if any, were placed on him.

12          MR. BRODSKY:  Yes, your Honor.  And I would add to

13     that, on June 2 they chose one of three methods to extract data

14     from the phone.  Cellebrite has three.  The most narrow of the

15     three is the one they chose.

16          I would add to that that even the narrow method that

17     they chose allows you to extract from the phone whether

18     information was deleted but recovered, or found in a deleted

19     section of the phone, or otherwise attempted to be deleted.

20     That would all, of course, be something had the FBI had the

21     phone, we'd have access to.  And that we think we would be

22     entitled to that information in cross-examining Mr. Tappeto.

23          The final and fourth issue is even assuming we get

24     these reports, our argument, your Honor, is without the access

25     to the actual extraction and doing the challenging and the

N6CQGOE1

1    testing, we believe the probative value, which is very minimal,

2    is outweighed by the unfair prejudice.

3        THE COURT:  I think that's a good job of framing, and

4    I think we have the issues framed, and I think I was right to

5    amend my response.  I think the first issue, is it expert or is

6    it lay, because that goes to whether it be appropriate to

7    exercise my discretion or how to exercise it.

8        So I'm going to give you a choice, Mr. Brodsky, to go

9    first or second on that issue.

10       MR. BRODSKY:  I'm happy -- since I'm standing, I'm

11   happy to go first, your Honor.

12       THE COURT:  Okay.

13       MR. BRODSKY:  What I would say to it is I would refer

14   to the case *United States v. Ray* case of Judge Liman.

15       THE COURT:  I've read it.

16       MR. BRODSKY:  I think Judge Liman does a very good job

17   of essentially saying it is a close question.  There are

18   courts, we've cited to your Honor, not in this district, which

19   have definitely said it's expert testimony.

20       I think if you look at the cases, the trend, is that

21   it is appropriate for specialized knowledge outside the average

22   lay person's understanding.  I think in today's times,

23   especially the ones we live in, when people hear extraction by

24   a forensic digital examiner, they think, oh, that person has

25   specialized knowledge; that person has something that they know

N6CQGOE1

1    that I don't know.

2            I think it's fairly apparent that if you ask the

3    average person, do you know how to extract data from the phone?

4    What are the different methodologies?  What are the limitations

5    what are the flaws?  What are the deficiencies?  What are the

6    different sections of a phone?  I think most people don't know

7    that.  I certainly don't.  I had to read up on it over the last

8    few days.  But what Judge Liman said was it's a close question,

9    and the *Marsh* case which the government cites is very different

10   than here because in the *Marsh* case --

11           THE COURT:  He's an FBI agent.

12           MR. BRODSKY:  An FBI agent, and they confirmed the

13   actual data from the phone.  They looked at all the messages,

14   not just the ones that were purportedly deleted.  The

15   government doesn't surmount this problem by having somebody

16   say, oh, I read the report and I can identify those messages,

17   and I called Mr. Niranjan.  And he says, oh yeah, those

18   messages aren't on my phone now.

19           That is far different than what happened in *Marsh*.

20   It's far different than what happened in the SEC case that they

21   rely on, which relies on *Marsh*, and the government had choices

22   here.  They decided not to take possession of Mr. Niranjan's

23   phone.  They made the choice to allow a third party under

24   Mr. Niranjan's control and direction to access and extract and

25   decide what to do with the phone.

1          The reason it's expert knowledge is fairly simple.  It

2     requires specialized knowledge.  Even if they try to narrow his

3     testimony and say we're just going to ask him what he took out

4     of the phone, it's still beyond the knowledge of an average lay

5     person.

6          So I think Judge Liman appropriately said in that

7     case, regardless of expert or not, even if it's a close line,

8     here are all the difference disclosures you're going to be

9     required to make well in advance of trial.

10          THE COURT:  Of course, Judge Liman was clear he wasn't

11     deciding the question of whether it was expert or fact

12     testimony.  Disclosures in that concept were kind of the legal

13     version of chicken soup:  What's the harm, make the

14     disclosures, I'll decide this down the road, and noted it was a

15     close question.

16          MR. BRODSKY:  That's right, your Honor.  That's why we

17     would turn to *Daniels* and *Belosi*, which are court cases that

18     said, yes, the process here is beyond the ken of a lay jury,

19     and, you know, *United States v. Belosi* was the Eastern District

20     of New York*, United States v. Daniels*, of course, is a Southern

21     District of California.  None of the government cases I think

22     do much other than say those are situations where the agents

23     themselves had the data, extracted the data, and provided

24     information presumably about how they did it to the defense.

25     We haven't been able to find a single case, your Honor, and

N6CQGOE1

1    they don't cite any, in which this issue has come up.

2              THE COURT:  Let me hear from the government.  Thank

3    you.

4              MR. THOMAS:  Judge, I will at least begin on this

5    topic.  Mr. Rothschild will surely pop up at some point to

6    assist.  I think the basic issue is also a framing issue here,

7    which is what is it we intend to elicit from the witness by way

8    of evidence.  It is possible one could put Mr. Tappeto on the

9    stand and ask him all manner of questions about the operation

10   of Cellebrite forensic technologies.  We aren't doing that.

11             What Mr. Tappeto will say essentially to answer the

12   question do these messages come from that device on a specific

13   day, and he'll say yes.  And if explored on cross-examination,

14   the answer to why is he'll say, "I used a piece of software to

15   take the messages out."  That's a subject that every juror who

16   has a cellphone, which is every juror, will readily understand,

17   they could be understood, and that the weight of which, which

18   is essentially the challenge Mr. Brodsky is making, could be

19   challenged to whatever degree he sees fit on cross-examination.

20             Are there different techniques?  Sure.  Ask the

21   witness; you could.  But the availability of different

22   techniques doesn't make the testimony that he has personal

23   knowledge that these messages derived from that phone on one

24   day any more expert than it would be for any other witness.

25             The argument about it being an FBI agent or not an FBI

agent really is neither here nor there on the expert issue.

It's of no moment whatsoever who employs or pays the witness

who has the personal knowledge to make them an expert or not.

The gravamen of the issue is the testimony.

Mr. Tappeto will not be offering opinion testimony.

He'll be offering personal knowledge testimony, which 901 says

is the basis for authenticity to say these messages came from

that phone on that date, and it's in fact I think now pretty

clear that the date is really the crux of the dispute here.

There's not a serious dispute that these messages weren't on

the phone or they were not messages between the defendant and

Mr. Niranjan.  It's just were they on the phone on that day,

and I think that draws special focus to the lay nature of the

testimony because it's not a theoretical digital metaphysics

dispute about what kind of file this is or what it means.  It's

just asking Mr. Tappeto were these messages on the phone on the

2nd, were these other messages on the phone on the 10th.  And

the Court rightly pointed out, an agent here compared the two

files, and will say:  Here are 13 messages in file one that

cannot be found in file two.

Now, the degree to which there were other sets of data

or limitations to the sample set for that comparison fruitful

grounds for cross-examination, but the essence of the testimony

is just did the messages come from the phone, and did these

messages come from the same phone on the second day?

N6CQGOE1

1          THE COURT:  All right.  Anything else on the expert

2     issue?

3          MR. THOMAS:  No, your Honor, other than to say I think

4     *Marsh*, while being a different set of facts, makes plain that

5     this kind of thing can be within the ken of the average person,

6     which now years after *Marsh* in a world of cellphones is more

7     true than it was then.

8          THE COURT:  At this point, I am ready to rule on the

9     expert versus lay testimony situation, and I've looked at the

10     *Belosi* case, the *Daniels* case, the *Ray* case, as well as *Marsh*,

11     *Chavez* or *Lopez* -- and I'm trying to discern my own

12     scribbling -- the Ninth Circuit case, which I think is *Berry* if

13     my scribble is correct.

14          And I think the *Marsh* decision, which is a summary

15     order, was very close to point and remarkably thorough in its

16     description of the issue.  It was the use by a special agent of

17     the FBI of the Cellebrite universal forensic extraction device

18     to download and review the contents of two cellular phones

19     belonging to *Marsh*'s girlfriend.

20          And the argument on appeal was that was the improper

21     elicitation of expert opinion testimony, and the Court notes

22     that the federal rules allow the admission of fact testimony so

23     long as the witness has personal knowledge, while opinion

24     testimony can only be presented either by a lay or expert

25     witness, "a witness's specialized knowledge" -- this is quoting

the *Rigas* case which was a reported case of the Second Circuit

-- "or the fact that he was chosen to carry out an

investigation because of this knowledge, does not render his

testimony 'expert' as long as it was based on his

'investigation and reflected his investigatory findings and

conclusions, and was not rooted exclusively in his

expertise...'"  And the special agent in that case explained

his training in Cellebrite technology to retrieve text and

other data from a cellphone, described how he used Cellebrite

to do so, and testified that he confirmed the results by

checking the message on the phone itself.

     "He did not purport to render an opinion based on the

application of specialized knowledge," says the Court, "to a

particular set of facts, nor did his testimony turn on or

require a technical understanding of the programming or

internal mechanics of the technology," and, therefore, the

Court affirmed the district court's evidentiary ruling in

*United States v. Marsh*, 568 F.App'x 15.

     Now, subsequent to that, the Fourth Circuit in *Chavez*

*Lopez* had a Cellebrite case and cited *Marsh* and came out the

same way, again, in an unreported decision of the Fourth

Circuit.  And I thought Judge Liman got it right, did it right

in *Ray*.  There were many issues other than cellphone extraction

including interpretation of metadata, analysis of images from

laptops, external storage drives and cellphones.  It included

N6CQGOE1

1  an issue here.  And Judge Liman decided that he didn't need to

2  decide whether it was expert or lay.  It was a close question

3  on the facts presented to him, and so he required an expert

4  disclosure leaving the issue for another day.

5          So I conclude on balance that this testimony as

6  described to me on the record is more akin to fact testimony

7  rather than expert and, therefore, an expert disclosure was not

8  required.  There remains the question of whether or not the

9  government should be given leave to call this witness though

10 it's after the date by which it said it would disclose

11 witnesses.

12          Is there anything further, Mr. Brodsky, you want to

13 say on that issue?

14          MR. BRODSKY:  No, your Honor, I just would note -- and

15 I know you know this, your Honor, it puts the defense in a

16 difficult position, I would just say, because I know the

17 government is going to call Mr. Tappeto, and he can say, "I

18 just did this to this phone."  If we cross-examine effectively,

19 we run a very substantial risk of turning him into an expert,

20 and I understand your Honor knows that, and it's a challenge

21 that we have on the defense.  I'm just open with your Honor

22 about it.

23          THE COURT:  I know what you're saying, and I have to

24 do what a judge does, is listen to the question, listen to the

25 testimony, and rule at that time.

N6CQGOE1

1          It seems to me that what happened here was suboptimal

2      and should not have happened.  It did happen.  And I think the

3      interests of justice are served by allowing the testimony in,

4      and it sounds like it will be -- the direct will be brief.

5      We'll see what happens with the cross.

6          MR. BRODSKY:  Your Honor, if I may be heard just on

7      the witness list.  The government has had this discrepancy

8      report, because they gave it to us over a year ago.  They asked

9      for these deadlines.  You so ordered the deadlines.  Deadlines

10     are deadlines.  And they are weeks over the deadline.  They

11     don't have good cause.  What they say is it doesn't cause us

12     unfair prejudice.

13         THE COURT:  Well, this is what I invited you to argue

14     just a second ago.

15         MR. BRODSKY:  Well, no, I thought we were arguing the

16     expert opinion.

17         THE COURT:  No.  I ruled on that.

18         MR. BRODSKY:  Right.

19         THE COURT:  Then I said anything you want to say on

20     the timing.

21         MR. BRODSKY:  I apologize, your Honor.

22         THE COURT:  That's what I've asked you, and now I've

23     ruled on the timing, and I'm going to allow it because I

24     believe the good cause, it's in the interest of justice and

25     because of the narrow frame of the witness's testimony the fact

N6CQGOE1

that the two extraction reports were produced in August of

2022.  I understand, you know, you say, well, this is good

news, it wasn't -- they didn't designate a witness.  I'm not

hearing argument.  I've ruled --

MR. BRODSKY:  Sorry, your Honor.

THE COURT:  -- on the timing issue.  I gave you

opportunity to argue on the timing issue.  We're not having a

debate on this or anything in this.

I will say this, that I will also consider the 403

issue that you did raise.  You raised 403.  So far it looks to

me like the probative value is not substantially outweighed by

the danger of unfair prejudice.  I reserve the right to change

my mind on that based on what I learn in the course of the

trial.

This, of course, still leaves open the subpoena issue.

I will frame this a little differently because I have a

viewpoint in mind.  Why should I not order that any written

embodiment of a communication between Tappeto and the Morvillo

firm be produced pursuant to that subpoena, at least that part

of the subpoena ought to be enforced?

MR. THOMAS:  Judge, I think as long as that's with

respect to these two reports and not other engagements he may

have had with Morvillo, the government has no objection.

THE COURT:  Well, it would be engagements relating to

their client here, Mr. Niranjan.  And because, you know, I

1    don't know what's in there.  I don't know what they might have

2    said globally in engaging Tappeto that could reflect on this

3    issue.  It could be broad enough that it would be an

4    instruction whatever you do, don't look at the X.  You know,

5    and that's for this project and three other projects, whatever

6    you do, don't consider X.  It seems to me that's fair game to

7    know about.

8         MR. THOMAS:  Your Honor, we take the Court's point.

9         THE COURT:  Okay.  Mr. Brodsky, I just issued the

10   government an order to show cause.  They've responded.

11   Anything you want to say?

12        MR. BRODSKY:  No, I appreciate it, your Honor, and I

13   thank you for that.

14        And just for point of clarity, would that include --

15   again, I don't want reports of content, but would that include

16   if they send a report that says, you know, here's the content,

17   here are the categories, I'd like to know if, for example,

18   without having the actual messages, are there things in the

19   unrecovered or deleted, there are all sorts of categories when

20   they extract from a phone.

21        THE COURT:  In other words, were there other

22   categories, so we know extracted, not extracted, and you're

23   saying there could be a third or a fourth category.

24        MR. BRODSKY:  Well, within the extraction, apparently

25   Mr. Tappeto told us there are like 20 or 30 categories of

1    information:  Unrecovered, recovered but in deleted, you know,

2    various sections.

3          THE COURT:  Why shouldn't that be produced?  Let me

4    hear from the government.

5          MR. THOMAS:  Well, your Honor, the -- if Mr. Brodsky

6    is envisioning some kind of cover page that says 23 files

7    deleted, 52 files unrecoverable, no objection to that being

8    produced.  But as the Court knows, those -- the way these

9    typically work is there's a hyperlink then to the 53 messages,

10   and those messages may be --

11         THE COURT:  The content of the messages is that it's

12   beyond the scope of the subpoena.  That I've said.  But

13   otherwise it seems to me that which bears on the work he did

14   and what he found ought to be fair game.  So if he had, again,

15   deleted, non-deleted and maybe deleted comes in three flavors,

16   I think the defense is entitled to know that.  And if

17   non-deleted comes in four flavors, I think the defense is

18   entitled to know that.  I have no idea what the flavors are,

19   but...

20         MR. THOMAS:  Your Honor, we once again take the

21   Court's point, but just to make sure we effectuate the Court's

22   intention.

23         THE COURT:  Yes.

24         MR. THOMAS:  The idea is for any historical reports of

25   that nature, not for Mr. Tappeto to undertake to generate new

N6CQGOE1

1    work.

2              THE COURT:  No.  This is production of that -- what I

3    believe the defense is entitled to know is, was there anything

4    in the interaction which infected the authenticity of what the

5    witness did.  And if there is, the defense wants to know it,

6    and I want to know it.  I think that's absolutely fair game.

7              MR. THOMAS:  Yes, your Honor.

8              THE COURT:  So I'm waiting on our jury.  Is our jury

9    ready.

10             DEPUTY CLERK:  I'm waiting.

11             THE COURT:  We're still waiting?

12             DEPUTY CLERK:  No, I'm waiting on you.

13             THE COURT:  We'll defer on the transcript issue to

14   another time.  We've done quite enough.  Thank you.

15             I'm going to have marked right now and hand out to

16   counsel what I call an aid to memory, and we will mark it as

17   Court Exhibit Number 1.  And what I mean by an aid to memory,

18   it will at some point in this process be given out to jurors,

19   and so that when they go through the questioning, I can say,

20   well, what did you have your hand up on?  Question 13 or 12 or

21   11?  Or if there's a juror who hasn't been spoken to, and I

22   need to make sure that they understand what I was asking, they

23   may reference that.

24             It also has the schedule -- do you have another one

25   for Mr. Brodsky, please?

N6CQGOE1

And that's all it is.  It's not a questionnaire.
Nobody fills it out.  And it by no means is -- we don't have to
give one to everybody.  Two to a side is fine.  It is by no
means the voir dire.  The voir dire will include many followup
questions that do not appear on this document, but it is a
start, so...

DEPUTY CLERK:  Ten minutes, Judge.

THE COURT:  So now let's turn to transcripts while
we're dealing with waiting for our jurors.

So on the rule of completeness, this is actually
territory that is often traveled in criminal prosecutions where
there's a transcript, and the government says we want to offer
these statements of the adverse party as evidence against the
adverse party, and the rules of evidence allow us to do that.
There are other things in the transcript that might be useful
or helpful to the defendant.  And, of course, they're entitled
to know the entirety of what's in the transcript.

But the law of evidence does not mean that the fact
that the government is using a portion of a recording, that the
defense may offer other portions of the recording that are
helpful.  The rule of completeness does require that where in
fairness, it's necessary to offer at the same time -- or where
in fairness, another portion of the transcript should be
offered at the same time so as to not leave a misleading
impression.

1          So I will give you an example.  There is a

2     conversation about paying money for the thing, and there's

3     repeated conversation about "the thing."  Elsewhere in the

4     transcript it's clear that the thing is a red Corvette

5     convertible.  The defense can compel and I can compel, and I

6     should compel, the government to offer that portion at the same

7     time.  But what it does not mean is that if there are

8     exculpatory statements also in the transcript, that they get to

9     be offered under the rule of completeness.

10          Now, I took from the correspondence before me that

11     there are ongoing discussions on the application of the rule of

12     completeness.  So, therefore, I'm going to hands off that one

13     for the time being and allow you to continue with your

14     discussions on that rather than my trying to referee something

15     that isn't ripe for refereeing.

16          Now, there is a second issue which I understand

17     Niranjan reviewed, if I'm correct about this, Hindi portions of

18     the tapes and made handwritten markings on the Hindi portions

19     of the translations.  Do I have that wrong?  Do I have that

20     right?

21          MR. NAFTALIS:  Your Honor, it's both the English and

22     Hindi.

23          THE COURT:  Both English and Hindi.  All right.

24          Now, the government has a nifty stipulation which says

25     we're going to give you drafts of the tapes, of the transcripts

N6CQGOE1

of the tapes, and you swear on your youngest child that you

will never refer to them in any way, shape or form because

they're only draft.  Fine.

        But they also live in a different world, and the world

that they live in is they're 3500 material and possibly *Giglio*

material.  Now, I have no idea, but it would seem to me that if

the witness in his own handwriting, his own handwriting is

injecting a biased and baseless version of what's on the tape

writing it in, making up stuff that's not there.  I'm not

saying this happened.  I'm just trying to analyze an issue as

the judge.

        If that happened, I don't see why the defense can't

use that in cross-examination despite the stipulation because

that existed as a transcript subject to the stipulation but it

also existed as 3500/*Giglio* material.  That's how I approach

this, and I put this out here, and I give both sides the

opportunity to tell me why I'm wrong.

        MR. NAFTALIS:  Your Honor, we agree that when

Mr. Niranjan made edits on the drafts, that's 3500 *Giglio*,

which is why we turned it over, but it's very common for a

participant in a conversation, whether a wiretap or consensual

recording, to listen and try to confirm.  And in this case the

drafts that were initially prepared were prepared days after

the recording to get ready to charge the case; not for trial.

And we are not using Mr. Niranjan as the person to authenticate

1      the transcript.

2              We're calling an independent court certified

3      translator.  So what we think they're trying to do is not to

4      impeach the transcript that's coming in.  It's to impeach

5      Mr. Niranjan in some way about something that is really outside

6      his testimony.  So the idea that he was injecting bias, we

7      understand it could be proper ground for cross-examination.

8              The fact that these may be difficult to hear is what

9      it is, but the idea that there is going to be competing

10     transcripts flying around, I think is meant to effectively

11     cross-examine the court certified interpreter.  And sort of

12     stepping back, what we don't quite understand if the defense

13     wants the entire transcript to come in, they're presumably not

14     challenging the authenticity or accuracy of them.  We don't

15     quite understand what the relevance is of cross-examining

16     Mr. Niranjan.

17             THE COURT:  Well, we're going to find out.

18             MR. NAFTALIS:  Other than to effectively say the

19     transcripts aren't really accurate because over a period of

20     trial preparation, they evolved, which, as your honor knows,

21     happens all the time when you are getting ready for trial.

22             That's the purpose, to step back, of the stipulation,

23     which is what the Eastern District cases say is:  Listen, we're

24     going to give them to you early, but you can't just then show

25     up and say, aha, some words came and went.

1          THE COURT:  No, I fully agree with that.  But what

2     changes the dimension is that it's in the hand of the witness,

3     and we're talking about cross-examination of the witness.  I

4     want to -- I'm going to let Mr. Brodsky or one of his

5     colleagues just without -- I'm not asking for a full preview of

6     the cross-examination, but on what areas where you think it's

7     permissible for you to use the transcript with Niranjan.

8          MR. BRODSKY:  Your Honor, we agree with your analysis

9     and comments, and, that is, if Mr. Niranjan made statements in

10     a draft transcript in his handwriting days after recorded

11     conversation which he participated and which he had access to

12     the recording, because he did, and he made, you know,

13     hypothetically, let's say -- I'm not saying this is what he

14     did, but let's say hypothetically he made something up that's

15     not there or let's say he said something that was just so

16     untrue, then I think we're entitled to cross-examine him

17     regarding his credibility.

18          We don't know what Ms. Shah, that's a totally separate

19     issue.  We don't believe the stipulation covers Mr. Niranjan's

20     3500 material with his comments.

21          THE COURT:  I think what I'm inclined to do in

22     addition to allow you to elicit testimony bearing on

23     Mr. Niranjan's credibility, what I'm prepared to do is before

24     or when you launch into this area of cross-examination, have an

25     instruction to the jury.  I've allowed this cross-examination

N6CQGOE1

1    not on -- this is not on the accuracy of the transcripts.  This

2    is on whether there is anything in relation to Mr. Niranjan's

3    handwritten comments on a draft that should bear on his

4    credibility and that's why I'm allowing this cross-examination

5    and for no other purpose.

6              What do you think of that, Mr. Brodsky.

7              MR. BRODSKY:  One second, your Honor.

8              (Pause)

9              MR. BRODSKY:  That's fine, your Honor.

10             THE COURT:  All right.  And what's the government's

11   position?  Beyond you can't do any of this because of the

12   stipulation.

13             MR. NAFTALIS:  Your Honor, final instruction, we'll

14   see how the cross-examination develops, but --

15             THE COURT:  I think what I'm going to ask is if the

16   government could take a look at this transcript of today and

17   work with Mr. Brodsky on something nice and clean, okay, and

18   acceptable to both sides.

19             MR. NAFTALIS:  Yes, your Honor.

20             THE COURT:  With that, I'm going to luxuriate for a

21   few minutes before the jury is ready.  We are in recess.

22             (Continued on next page)

23

24

25

N6C6GOE2                         Opening - Thomas

1           (Voir dire occurred)

2           THE COURT:  Who will be opening for the government?

3           MR. THOMAS:  I will, your Honor.

4           (Jury present)

5           THE COURT:  Please be seated.  I understand Mr. Thomas

6    will be delivering an opening statement for the government.

7    Whenever you're ready, sir.

8           MR. THOMAS:  Thank you, your Honor.

9           About one year ago in an apartment building just

10   blocks from where we are right now, this man, Brijesh Goel,

11   huddled in a stairwell with his friend destroying evidence.

12   Together, Goel and his friend scrolled through his friend's

13   phone, selecting messages to delete.

14          Why did Goel do that?  So he could erase evidence of

15   the other crime he had committed:  A criminal insider trading

16   scheme.  A scheme where Goel took information about big

17   business deals from Goldman Sachs, his employer, and shared

18   that information with his friend for stock trades, a scheme

19   where Goel shared that inside information six times.  Six

20   times.  So that he and his friend could make an illegal profit

21   in the stock market.

22          That day when the defendant was in the stairwell

23   deleting messages, he was doing that because he was afraid that

24   he might have been caught.  See, just two weeks earlier, the

25   FBI knocked on his door, visited Goel, and asked him about

1    stock trading.  Goel lied to those agents, to hide what he had

2    done, and now in the stairwell, as he and his friend clicked

3    through and deleted messages, they deleted the ones that would

4    show their trading, and it was because Goel hoped to erase

5    anything, anything, that might reveal what he had done, but it

6    did not work.  The evidence was there whether Goel tried to

7    delete it or not.  And those messages, the very ones that he

8    tried to destroy in that stairwell, only confirmed what you

9    will learn from the proof at this trial:  Goel stole

10   confidential information and used it as part of an insider

11   trading scheme.  And that is why we are here today.

12           Goel has been charged with insider trading, and he's

13   been charged with obstruction of justice for destroying the

14   evidence of his scheme.

15           So some background on how we got here.

16           In 2017 and 2018, Goel worked at an investment bank,

17   Goldman Sachs.  Investment banks like Goldman Sachs assist in

18   mergers and acquisition, sometimes called M&A, when one company

19   buys another or two companies consolidate.  As part of his job

20   at Goldman, Goel received memos — lengthy, detailed writeups

21   about those deals.  Those memos included important, sensitive,

22   and secret information, like the names of the companies that

23   might be planning to merge, information about how much one

24   company might be willing to pay to buy another, projections

25   about when a deal like that might happen.

1           Those details, the who, the when, the what price,

2    those were details the average investor did not have.  They

3    were secret, and Goldman Sachs treated those memos as highly

4    confidential.  They even stamped them on every page with the

5    words "internal use only."  But in 2017, Goel decided to betray

6    Goldman Sachs, and to use the "internal use only" memos, the

7    inside information, for himself.

8           Goel decided to take confidential information about

9    those M&A deals that he learned from his job and use that

10   information illegally by trading in the stock market.

11          To put his plan into action, however, Goel needed

12   help.  Specifically, he needed an account that was secret from

13   his bosses.  That's because Goldman Sachs monitors its

14   employees' accounts to prevent improper trading.  That's when

15   Goel turned to his close friend Akshay Niranjan.  Niranjan

16   worked at a different bank, and that bank had similar rules,

17   but Goel's friend Niranjan decided to already break those

18   rules.

19          Niranjan had his own brother create a brokerage

20   account, and Niranjan used that account for his own stock

21   trades.  That meant the defendant had secret inside information

22   from Goldman Sachs, and the defendant's friend had an account

23   set up for secret trading.  And so Goel and his friend worked

24   out an arrangement to help them both.

25          Goel would give Niranjan stock tips.  Niranjan would

1    make those trades in the account that he secretly controlled.

2    And if the trades made money, the men would agree they would

3    split the profits.

4            Beginning in 2017, that is what happened.  In

5    February, Goel gave his friend a tip, and his friend traded.  A

6    few months later in April, Goel gave his friend another tip,

7    and his friend traded again.  A few months after that, in

8    September, Goel gave his friends still another tip, and the

9    friend traded yet again.  In 2017, in 2018, Goel and Niranjan

10   made lots of the trades in this way.  You will learn of six

11   time these stock trades were based on information stolen from

12   the Goldman Sachs memos.  Six times.  Six times Goel stole

13   secret information from work, and tipped his good friend by

14   telling him which securities to buy for the secret account.

15   And each of those six times, Niranjan used Goel's tips to

16   trade.

17           Some of those trades turned a decent profit, some

18   didn't.  But each time Goel knew where to place their bets

19   because Goel knew something no one else knew:  He knew that

20   inside information.  So unlike the average investor, Goel knew

21   exactly which pitches to swing at.

22           One trade they made with that secret information

23   turned into a home run.  Goel had obtained a memo at Goldman

24   about a billion-dollar takeover of a company called

25   Calgon Carbon.  Within hours, he told Niranjan about Calgon.

N6C6GOE2                    Opening – Thomas

With this one, he said, make sure you don't miss out.  And

within days, Niranjan made $53,000 in trades in that secret

account.  When the Calgon deal happened, the stock shot up, and

Goel and his friend turned $53,000 into $300,000 — nearly a

600 percent return in less than a month.

        Now, of course Goel did not want to get caught, so he

carefully avoided sharing his tips in writing or even by phone.

Goel even once used a code to hint at what's going on without

saying it outright, but for the most part, Goel just shared

these tips in person when he met Niranjan, like when they met

to play squash or to grab something to eat.

        Eventually, Niranjan switched to a job in London.

Goel could no longer meet with his friend, and the insider

trading stopped.  That's where things stood until 2021, when

Goel asked to settle up to get his cut of the profits from the

secret trading.  At first, Niranjan hesitated because sending

tens of thousands of dollars to Goel might attract attention.

So Goel proposed that they use a cover story, say that the

payment is just a loan.  And with that, with the cover story in

place, Niranjan sent $85,000 straight into Goel's bank account.

        Not long after that, the FBI showed up at Goel's front

door asking questions about Niranjan, about trading.  And

during that interview, Goel admitted some unavoidable facts.

He admitted that he knew Niranjan.  He admitted he had received

confidential memos at Goldman Sachs, and Goel admitted he was

1    not supposed to share what he learned at work with others.

2             But Goel also misled the FBI.  He offered up the cover

3    story about needing loans.  He denied that he ever gave

4    Niranjan any information from Goldman Sachs.  Within days,

5    however, Goel realized he might need more than a cover story.

6    He needed a coverup.  So Goel called Niranjan to arrange a

7    meeting like old times.  But this meeting, though, Goel didn't

8    simply pick up the cell phone, call his friend, send him a text

9    message.  Instead, he went down to the gym in his apartment

10   building and had an attendant call Niranjan, hoping to avoid a

11   record of a call to the same person who had tipped him with

12   inside information just days after the FBI had stopped by.

13            Now, by that time, Niranjan had moved back from London

14   to New York.  And they literally lived in the same apartment

15   building, a high-rise just a few blocks this way.  But the

16   defendant didn't ask Niranjan to come over it his apartment.

17   He didn't say, I'll come meet you at your place.  He didn't say

18   let's talk in the lobby.  This time, now that the FBI was onto

19   him, Goel arranged to meet Niranjan in the building's empty

20   stairwell.

21            When they met in this stairwell, Goel decided the

22   subject was so sensitive he had to whisper to his friend, even

23   though there was no one around.  And what the defendant

24   whispered was they should delete any messages that would reveal

25   what they had done.

1          They met again two weeks later, once more hiding in

2     the stairwell.  And at that meeting at the end, Goel told

3     Niranjan that when he and Niranjan spoke about what happened to

4     anyone, they had to be consistent.  His words were, they must

5     be the same from day one.  There should not be a break in our

6     story.  The message was simple.  We need to get our stories

7     straight.

8          A few days later, they met yet again, a third time.

9     And again, they met in a stairwell.  And during that meeting,

10    Goel and Niranjan clicked through messages on Niranjan's phone,

11    identifying the ones that might reveal what they had done, and

12    they deleted them.

13         Now, Goel's stairwell meetings, his hushed directions,

14    the deletions from the phone, that might have worked, but what

15    Goel didn't realize was that by the time of that third meeting,

16    his friend Niranjan had decided to help the FBI.  In fact,

17    Niranjan had already met with the FBI, and Niranjan had already

18    preserved the messages on his phone.

19         When Goel told him in the empty stairwell what to

20    delete, Goel just revealed exactly which messages he most

21    wanted to hide.  And when Goel whispered in the stairwell to

22    avoid anyone overhearing him, to avoid his words coming back to

23    him in the future, all he did was make clear that he was

24    destroying evidence.  Because in the stairwell that day, Goel

25    was being recorded.

1           At this trial, you will hear the defendant's whispers,

2     you will hear when this man here tells his friend "delete."  By

3     the end of this trial, you will know why Goel tried to delete

4     evidence that day because he engaged in a scheme to commit

5     security fraud, and he didn't want to get caught.

6           We will prove all of this to you through a combination

7     of witnesses, records, photographs, and recordings.  For

8     example, you'll hear from someone from Goldman who will explain

9     investment banking and the importance and secrecy surrounding

10    these deal memos.  You'll hear someone who can explain how

11    securities trades work and walk you through the accounts.

12    You'll hear from the FBI agent who spoke to Goel, and you'll

13    hear from Niranjan himself.

14          As you listen to that testimony, there are a few key

15    pieces of evidence you may want to look out for.

16          First, you're going to see examples of the

17    confidential deal memos that Goel received.  You can see on

18    yourself, they're stamped in big red letters "for internal use

19    only."

20          Second, you're going to see messages between Goel and

21    his friend Niranjan where Goel and Niranjan arranged to meet,

22    including messages sent the same day or the day after Goel

23    received the confidential deal memos.

24          Third, you're going to see stock trading records from

25    the hidden account, the one that Niranjan controlled.  Those

N6C6GOE2                    Opening - Thomas

records will show stock option trades in the same companies
discussed in the Goldman memos.

Fourth, you're going to see bank records that show a
wire transfer from Goel's friend, Niranjan, to Goel in the
amount of $85,000.

The memos, the messages, the trading, and bank records
will allow you to see that Goel received secret deal
information, set up meetings with his friend, and shared in the
profits of the trading.  And as I said, you will hear directly
from Niranjan himself.

Niranjan will tell you how Goel supplied him with
trading tips, and he used those tips to trade in an account
that he had hid in his brother's name.  He will tell you that
he and Goel traded a lot in securities from many companies, and
Niranjan will tell you that for six of those trades, Goel's
tips were so good, Niranjan asked if the tips were based on
inside information from Goldman Sachs, and Goel denied it.  But
you'll hear that as Goel's tips about deal possibilities kept
coming true, Niranjan concluded that he and Goel were not just
trading in a secret account, they were trading on inside
information.

Now, Niranjan will take the stand pursuant to an
agreement that requires him to testify in order to avoid being
prosecuted.  And his testimony about his good friend will be
personal.  So listen carefully to it, scrutinize it, see how it

1    stacks up against the evidence.

2            I expect you will see that some trades he mentions,

3    the same ones show up in the trade records.  You will see the

4    meetings that he referenced in the text messages.  And you will

5    hear that even though the defendant took great pains to hide

6    and to whisper in the stairwell about deleting messages, some

7    of what he said was captured on tape.

8            As all of that proof comes in, we ask that you just do

9    three things:

10           First, pay close attention to the evidence.

11           Second, follow Judge Castel's instructions.

12           And third, use your common sense.

13           If you do those three simple things, you will find

14   that Goel received inside information.  You will find that Goel

15   gave that information to his friend so they could place illegal

16   stock trades.  And you will find that when the FBI came

17   knocking, Goel tried to cover up what he had done.  That's why

18   at the end of this trial, you will find the defendant

19   Brijesh Goel is guilty as charged.

20           THE COURT:  Thank you very much, Mr. Thomas.

21           Mr. Ford, you're going to deliver an opening

22   statement?

23           MR. FORD:  I am, your Honor.

24           THE COURT:  All right.  Whenever you're ready.

25           MR. FORD:  May I proceed, your Honor?

1          THE COURT:  You may.

2          MR. FORD:  Brijesh Goel was framed.  He's been framed.

3    Brijesh Goel should not be sitting at that table right now.

4    Someone else should be.  Here's what I mean:

5          This is a case about disloyalty and deception.  You

6    heard that one friend turned on another.  I'm not talking about

7    the type of disloyalty where two people do something wrong and

8    a friend turns on the other.  That's not the disloyalty I'm

9    talking about.  I'm talking about the type where one person,

10   Akshay Niranjan, does something wrong and tries to pin it on

11   his friend, Brijesh Goel, who, in fact, did not commit any

12   crime.  That is the ultimate betrayal.  And that, ladies and

13   gentlemen, is what this case is actually about, and for that

14   reason, at the end, we're going to ask that you acquit

15   Brijesh Goel.

16         Before I go any further, let me just quickly introduce

17   myself.  You heard my name.  I'm Adam Ford.  It's an honor to

18   represent Mr. Goel.  I'm here with my colleague, Reed Brodsky,

19   Anjula Prasad, and Nicolette Beuther.

20         The evidence in this trial is going to show that

21   Niranjan has fabricated this story that you just heard.  And he

22   fabricated it in exchange for him not to be prosecuted himself.

23   And he fabricated it in exchange for him not to be deported,

24   which was his biggest fear.  Had he not done that, he would

25   have been charged, and if convicted, faced lying to the SEC,

1     insider trading, his own obstruction of justice, but he made a

2     deal.

3           You did hear the government tell you about

4     Akshay Niranjan.  He'd be the witness.  What they didn't tell

5     you is he's pretty much the only witness.  The government might

6     call some other witnesses from Goldman Sachs, but they weren't

7     there.  They don't know about the facts at issue.  They'll give

8     some background facts, most of which we'll probably agree with.

9     And they are going to ask you to convict Brijesh on the words

10    of this one man.

11          We believe that at the end of this trial, you don't

12    have to believe it now, but by the end when you've heard the

13    evidence, you are going to conclude that this one and only

14    witness is just not reliable.

15          Indeed, the government's theory of the case, the one

16    that Niranjan has told them, it's riddled with flaws.  And it

17    might take us a little bit of time to unravel each of them.

18    Bear with us.  Give us the time.  Stay with us.  Because we're

19    going to march through this over the next week, and we're going

20    to get to the truth.

21          Now, as I understand the government's opening and what

22    Mr. Niranjan is expected to testify to, he's going to come here

23    and he's going to say, I didn't want to receive any secret

24    inside information from my friend, Brijesh.  I didn't know I

25    was receiving any inside information.  I kept asking him, are

N6C6GOE2                          Opening - Ford

1    you sure this isn't inside information from Goldman Sachs?  And

2    Brijesh would assure him, it's not inside information.

3            He would have you believe, Mr. Niranjan, that he is a

4    rather gullible, unlucky, lots of words, to have a friend

5    having tricked him into engaging in an inside trading scheme

6    upon repeated requests to confirm that he is not actually

7    engaged in insider trading.  This story, we submit, does not

8    make sense.  And the evidence is going to show that it's

9    actually not what happened.

10           The government talked about this secret account.  We

11   talked a little bit more about it.  It wasn't really a secret.

12   It was a secret to Brijesh.  He didn't know that Niranjan was

13   trading out of his brother's account.  Other people knew.

14   Niranjan obviously knew, and Niranjan's brother obviously knew.

15   Niranjan's family obviously knew.  But Brijesh never had access

16   to this account.  Never saw it.  Never had any idea what trades

17   were being placed in it.  And he most certainly never got any

18   of the money from that account.  That money went elsewhere, to

19   Niranjan and his family.

20           Now, as the government mentioned, four years after the

21   alleged inside trading scheme ended, everyone, the point of --

22   the government will acknowledge 2018 it ends, and then they

23   point to this $85,000 payment.  It was a loan.  We're going to

24   talk a little bit more about that, but it had no connection to

25   these trading profits that Niranjan himself made from trading

1    in his brother's account.  And there's going to be evidence

2    that's going to show this.  So what we are in for?  This next

3    week is literally a once-in-a-blue-moon insider trading case.

4          We're going to have the person who traded, who kept

5    all the money, who was in control of all the trades, come here

6    and say he was tricked.  And then we've got the insider who is

7    accused of passing this information on, not having any idea

8    about the trades or the money or the account.

9          Now, when Niranjan comes in and takes the stand, he's

10   going to sound polished.  He might even sound convincing the

11   first go-around.  He's been practicing.  He's got a script.

12   He's been meeting with the government often to prepare, to tell

13   you this story that he wants to convince you of.

14          What we'd ask is that you reserve judgment.  Wait.

15   Wait until we have a chance to question him on some of these

16   points and pull back the facade.  Other than Niranjan's story

17   that he's going to come and tell, there's practically no other

18   evidence of this insider trading scheme.

19          The government claims that because the men were

20   careful — but we're talking about what the government alleges

21   to be a five-year insider trading conspiracy, during which time

22   the only pieces of evidence that references this alleged

23   insider trading scheme are three text messages, two of which

24   are, did you book the court?  And the other one, you alone?

25   That is the evidence they are going to point to that these men

N6C6GOE2                        Opening - Ford

1    were engaged in insider trading.

2           How about this one?  Did you book the court?  These

3    men played squash together two, three, four times a week, all

4    through the relevant time period, and were constantly texting

5    each other.  Did you book the court?  Yes, I booked the court.

6    The men were also close friends.  And because of that,

7    sometimes they had personal things to discuss.  Not trading.

8    Personal.  And so they would each use, you alone?  Nothing

9    nefarious about that.

10          With respect to the obstruction of justice charge, the

11   government opened on the scrolling of the phone, deleting

12   evidence he's trying to hide.  The evidence is actually going

13   to show that there was no attempt to obstruct justice.  There

14   was no obstruction of justice.

15          Now, Brijesh did utter the words on the tapes, we

16   should delete this, or delete, or words to that effect.  The

17   government is right about that.  But they didn't tell you what

18   he said moments later, which is, I've gotten a subpoena so I

19   should not delete, let me ask my lawyer.  And then they didn't

20   say what he said right after that, which is, listen, don't

21   delete this, let me check with my lawyer.  And then they didn't

22   say that it was Niranjan who was doing the deleting while he

23   was cooperating with the government, while he was trying to get

24   this non-prosecution agreement, while he was trying to

25   implicate Brijesh in any crime.

N6C6GOE2                         Opening - Ford

1          So at the end of this trial, we don't think the

2     government is going to be able to meet their burden of proof on

3     the obstruction of justice charge either.

4          Let me just take a step back and tell you a little bit

5     more about Brijesh because it's really important to the story,

6     and it's going to play into it.

7          Brijesh was born and raised in Haryana, India.  He

8     grew up in a modest family, but he worked really, really hard.

9     And he eventually got into the Indian Institute of Technology,

10    which is one of India's most prestigious universities.  If you

11    don't know much about, it's pretty much Harvard on steroids,

12    trying to get into it.  The only way to get in is through hard

13    work, and he got in, and he graduated with honors.  And

14    afterwards, he came to the United States where he attended the

15    University of California at Berkeley, where he graduated with a

16    master's in finance in 2013.

17         Afterwards, he started working for Goldman Sachs —

18    obviously, a well-known and prestigious financial institution

19    here in the city.  He worked there until 2021, during most of

20    the time that's relevant here.

21         He left Goldman Sachs in the middle of 2021, and he

22    started working at another well-known financial institution

23    called Apollo, where he is still employed.  He's on leave, but

24    in both his places of work, he enjoyed a reputation of having

25    honesty and integrity.  And Apollo, to its credit, is taking a

1    wait-and-see approach before deciding on any employment.

2              MR. THOMAS:  Objection, your Honor.

3              THE COURT:  Let me see you at sidebar, Mr. Ford.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Let me have a proffer on how you intend to

3      prove the defendant's reputation.

4              MR. FORD:  We've listed a number of witnesses on our

5      witness list that can act as character witnesses.

6              THE COURT:  You intend to call character witnesses?

7              MR. FORD:  Yeah.

8              THE COURT:  Okay.  And you intend to call the

9      defendant, is that what you're telling the jury, with giving

10     his background?

11             MR. FORD:  We don't know yet.

12             THE COURT:  Well, how are you getting his background

13     in?

14             MR. FORD:  I thought I was just doing a general

15     background.

16             THE COURT:  No, no, no, no.  You have to have a

17     good-faith belief it's going to be in the evidence.  How is it

18     going to be in the evidence?

19             MR. FORD:  The government is attaching exhibits, his

20     resume.  All of this information is in the exhibits that we've

21     talked about; where he worked, where he went to school.

22             THE COURT:  So you expect that this evidence is going

23     to be offered by the government; is that what your answer is?

24             MR. FORD:  Yes.

25             THE COURT:  I understand.  That's why I'm asking the

1    questions.

2              Any objection?

3              MR. THOMAS:  Your Honor has asked him for his

4    representation to Apollo, in particular, Apollo's wait-and-see

5    approach and invoking Apollo's --

6              THE COURT:  How are you going to get his reputation at

7    Apollo?

8              MR. FORD:  We have someone on our witness list who

9    works within Apollo.

10             THE COURT:  How would that be admissible evidence, his

11   reputation at Apollo?

12             MR. FORD:  His reputation -- I'm not certain, your

13   Honor.  His reputation within his community for where he works.

14             THE COURT:  Well, that would be the reputation in the

15   community, and your position is that would include his

16   reputation at Apollo?

17             MR. FORD:  Yes.

18             THE COURT:  Okay.  And reputation for what?

19             MR. FORD:  For honesty and integrity.

20             THE COURT:  Because I wasn't sure what you meant by

21   reputation.

22             Okay.  Anything else?

23             MR. THOMAS:  Your Honor, I heard Mr. Ford at the end

24   ascribe assessments to Apollo as an entity.  I don't think any

25   representative could speak on behalf of Apollo.  That's what

1    ultimately --

2                MR. FORD:  Apollo --

3                THE COURT:  Somebody is going to testify from Apollo

4    that he's on a leave of absence?

5                MR. FORD:  Well, no.  But he is on a leave of absence.

6    He's on -- I have a good-faith basis to say I know that --

7                THE COURT:  But have --

8                MR. FORD:  -- paid leave.

9                THE COURT:  But there are a lot of things that you may

10   know to be true, but the question is, will they be of evidence?

11               MR. FORD:  I'm happy to --

12               (Defense counsel confer)

13               MR. FORD:  Yeah.  The person that we have on our list,

14   who I just met with this week, is working at Apollo and is

15   familiar with everything --

16               THE COURT:  He knows that he's on a leave of absence.

17   I have that.  But how are you going to get that into evidence?

18   How would that be relevant, admissible evidence?

19               MR. FORD:  Well, it's relevant, part of his character.

20   It's part of his character.

21               THE COURT:  That he's on a leave of absence.  I don't

22   think so.  I don't get that.  I don't see how when you say,

23   tell me his employment status at Apollo, and there's an

24   objection raised, why wouldn't that objection be sustained?

25               MR. FORD:  Well, I -- my -- I don't want to just keep

N6C6GOE2                        Opening - Ford

1    repeating myself.  I thought I was completely in bounds.  I

2    wasn't trying to push the limits.

3         THE COURT:  I'm not accusing you of misconduct.  I'm

4    ruling on objections to an opening statement.

5         MR. FORD:  Yeah, in my argument is that we have

6    someone from Apollo who is able to testify as to his honesty

7    and integrity and able to testify as to the fact that he's on

8    leave.  And Apollo was not --

9         THE COURT:  I know he's able to.  That's not the

10   point.  I accept that he's able to.  That isn't what I'm asking

11   you.  He may know a lot of things.  He may know about the

12   defendant's wife, his background, his kids, his parents.  He

13   may know many, many things that he won't be able to testify to.

14   I'm asking you, why would it be relevant and admissible that

15   Apollo has him on a leave of absence?

16        MR. FORD:  I think it's relevant and admissible, your

17   Honor, because he has such a good reputation at Apollo that

18   they have not -- they're just taking a wait-and-see approach.

19   They don't know what to do here.

20        MR. BRODSKY:  Your Honor, I'm just going to add since

21   the government was putting in his resume, which included

22   Apollo, and included "through the present," it's fair for us to

23   argue that that's in evidence and that he hasn't been fired.

24        THE COURT:  Okay.  All right.  Continue.

25             (Continued on next page)

1            (In open court)

2            THE COURT:  Please, whenever you're ready.

3            MR. FORD:  Thank you, your Honor.  Thank you,

4    everyone.

5            Brijesh was married in 2014 to his girlfriend,

6    Natasha Garg.  Natasha is a doctor, worked at Mount Sinai, and

7    now at Jamaica.  She, unfortunately, is not present in the --

8            MR. NAFTALIS:  Objection.

9            THE COURT:  Let me see Mr. Ford at the sidebar,

10   please.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  The objection, please, sir.

3          MR. NAFTALIS:  Your Honor, the personal circumstances

4     of the defendant are irrelevant.  It's not clear how they're

5     coming in because they have not committed to the defendant

6     testifying, and they are trying to curry favor with the jury up

7     front.

8          THE COURT:  Well, let's say the defendant was

9     testifying, and the defendant said I'm now going to tell you

10    about my wife.  Would that be admissible?

11         MR. NAFTALIS:  No.

12         THE COURT:  So it really doesn't turn on whether he

13    testifies or not.  Go ahead.  What's the basis for getting into

14    evidence?

15         MR. FORD:  Again, we thought they were just doing

16    basic background stuff, but his wife --

17         THE COURT:  I don't understand what that means.  What

18    you open on is admissible evidence.

19         MR. FORD:  Yes, and --

20         THE COURT:  And you think his marital status and what

21    his wife does for a living is admissible evidence?

22         MR. FORD:  Well, I think it's part of the story

23    because it goes to the two of them buy a house upstate, and the

24    wife and Niranjan's wife are good friends, and his wife is an

25    integral participant of the story because it's a group of them

1    and his wife is not --

2              THE COURT:  You're here because of her employment

3    history specifically.

4              MR. FORD:  Oh, that was -- because I said she worked

5    at a hospital?

6              MR. THOMAS:  I think Mr. Ford was about to tell the

7    jury that his wife is unable to be here today because she has a

8    pending visa overseas.

9              THE COURT:  Is that what you're planning on going?

10   Because I think you said the word "unable," didn't you?

11             No, no, no.  Answer me, Mr. Ford.

12             MR. FORD:  Yes.

13             THE COURT:  You said the word "unable."

14             MR. FORD:  Yes.  We were going to explain that she's

15   unable to be here.

16             THE COURT:  How is that relevant, admissible evidence,

17   sir?

18             MR. FORD:  Well, to the extent that -- Judge, the

19   answer is, to the extent that the jury can draw a negative

20   inference because the government plans on talking about the

21   defendant's extramarital affairs, they've told us that, and

22   they are going to pull that out in their evidence, and so we

23   need to be able to respond as to why his wife is not here, and

24   it doesn't have anything to do with what their allegations are.

25             THE COURT:  How would you prove that?

1          MR. FORD:  How would I prove?

2          THE COURT:  What you just said you were going to

3     prove?

4          MR. FORD:  Why she can't get in?

5          THE COURT:  Yes.

6          MR. FORD:  If my client testifies, that would be one

7     way it could come in.

8          THE COURT:  That's why I'm asking.  I've asked you

9     this already.

10         MR. FORD:  I'm not -- obviously, I can't commit to

11    having my client testify.

12         THE COURT:  I understand that.  So how are you going

13    to get it into evidence?

14         MR. FORD:  One of the other witnesses who we've named

15    also knows about the friend group and the relationship, and

16    they talked about it, and indeed Mr. Niranjan would also talk

17    about it, and we'd get him to admit to these facts as well.

18         THE COURT:  But the wife's immigration status, how is

19    that probative of anything?

20         MR. FORD:  It's probative if the government --

21         (Defendant counsel confer)

22         MR. FORD:  I'll withdraw.

23         THE COURT:  Thank you very much.  Let's move on.

24         (Continued on next page)

25

1          (In open court)

2          MR. FORD:  May I continue, your Honor?

3          THE COURT:  You may.

4          MR. FORD:  Let's talk about Akshay Niranjan, the

5    government's sole cooperating witness.

6          You are going to hear a lot that Akshay Niranjan and

7    Brijesh Goel were very close friends during the relevant time

8    period.  Niranjan referred to Brijesh as like an elder brother,

9    and I think that was an apt description.

10         They first met at the University of California

11   Berkeley, although they weren't particularly -- they didn't

12   become friends at that time, but they both wound up in New York

13   City several years later, and they became quite close.  In

14   fact, on two occasions Niranjan follows Brijesh into the same

15   apartment building, to move in the same apartment building,

16   including with their girlfriends, and then later wives.

17         Notwithstanding this friendship, which I think was

18   true, Niranjan had a festering, deep-seated jealousy over

19   Brijesh.  He would frequently comment about Brijesh being more

20   successful, making more money, and the evidence is going to

21   show that this jealousy ultimately contributed to Niranjan's

22   betrayal.

23         Now, Niranjan as a witness, he has done a lot of --

24   strike that.  Niranjan has done a lot of things wrong.  He has

25   lied to the government in connection with the SEC, and the SEC

1   in connection with this investigation.  Now he's going to come

2   up here and he's going to try and tell you, look, yes, I lied a

3   lot before.  I lied a lot.  But now I'm telling you the truth.

4   And he's going to ask you to believe that he was only lying

5   before; not lying now.  But we think the evidence is going to

6   show that he's lying now.

7           And one of the things you all are free to consider,

8   and you should consider, is that Niranjan is coming here and

9   testifying under a non-prosecution agreement.  Now the

10  government mentioned it, but let me talk a little bit more

11  about it.

12          This means that he will never be charged for any of

13  the crimes that he committed, and, in exchange, he comes in and

14  gives his testimony, but -- and in addition to not being

15  prosecuted, he won't be deported.  And so he made a trade,

16  which was protecting himself coming in and telling you the

17  story that he's going to tell, and you are all free to consider

18  that when weighing his credibility and his bias as a witness.

19          Now, you might be thinking, okay, even if the

20  government's only witness, contemporary factual witness has

21  bias, has motive to lie, is untrustworthy, what will the

22  evidence show about the other investigation, you know, the rest

23  of the investigation the government did before indicting

24  Brijesh.  And I wish the answer were different, but the truth

25  is that the government relied extensively on Niranjan's story

1   in deciding to indict Brijesh.  They did not go and collect all

2   of the records that were available, and they indicted him --

3   they indicted Brijesh only six weeks after Niranjan first comes

4   into the office.  That is a very fast time.  So the

5   investigation that they did prior to this indictment was not as

6   fulsome as it could have been.

7          Let me talk a little bit about the allegations.  This

8   case really comes down to allegations that there were six tips

9   passed between February 2017 and the middle of '18.  And let's

10  talk a little bit about that.

11         First off, obviously, when people work in jobs that

12  they come in contact with confidential material nonpublic

13  information or other privileged communications, a lot of people

14  receive it:  Doctors, lawyers, bankers, accountants.  People

15  know that at your job and in connection with your work, you

16  receive confidential information, but sometimes that

17  information becomes public.  Lawyers certainly see this all the

18  time.  We work on something, and then there's a public filing,

19  and you're free to talk with your friends and family about the

20  public filing.  So you are going to see text messages where

21  Brijesh is texting public news articles on deals that he worked

22  on, particularly when he was winning awards for his excellence

23  in his job.  And so we're going to see that.  And he was doing,

24  frankly, what I assume most people do when talking about their

25  work is that they can talk about what's public, but not what's

confidential, which brings me to this -- the Goldman Sachs

memos, the confidential memos.

He was on an email distribution list with a somewhat

large group of people at Goldman Sachs, and he would receive

these memos: FWCC, CMCC.  It doesn't matter if you remember

the acronym.  He got these memos.  They contain confidential

information.  They will contain material nonpublic information.

I don't know all of them, but they were confidential, but

Brijesh knew everything in all of those memos was confidential

and can't be shared outside of Goldman Sachs.  It's not in

dispute.  He knows that.  Of course it's confidential.  He knew

he couldn't share it.

Now, Niranjan is going to come in, and he's going to

tell you a story about what he claims Brijesh told him about

these memos; and if he says what he said in the past, he's

going to get it very wrong, and this is going to be something

for you to consider and weigh.

Now, will you have reasonable doubt as to this core of

the case, the seven -- the six ticker symbols.  At the end of

this trial, I think there is going to be a lot of evidence to

give you that reasonable doubt.  Let me just talk about three

of them.

First, there were six trades, only two of which made

money.  The other four lost money.  That can give you a little

bit of pause.  Maybe that doesn't decide it for you, but two

people, two highly sophisticated individuals are engaged in
insider trading, and we pause on why only two of the six
trades, seven actually, were successful.  Brijesh never
receives any of the money.  I mentioned this, but it bears
repeating.  He doesn't receive any of the money at the time or
later.  We'll talk about the loan.  And yet Niranjan's family
gets a lot of the money.  His younger brother gets some of it.
His father gets some of it.  Niranjan has said that he has
given all of them -- either gave the money away to family
members or lost it in other legal trades unconnected to
Brijesh.  That's the second reason.

        The third is that Niranjan can't even keep his story
straight with respect to these tips.  The first alleged tip was
a company called Lumos.  This was the first time that there was
supposedly this passing of inside information.  When Niranjan
spoke with the government, not on one occasion, but on two
separate occasions, he says unequivocally Lumos is not from
Goel.  He tells the government that twice.  It's only much
later that he just remembers the first time he started in
insider trading he could remember that Lumos was from Goel.  He
changes his story on that.  He changes his story with respect
to just about all of the other tips as well.

        He says two of them happened when they were in a
swimming pool.  Then he his comes back and says never mind;
they weren't in a swimming pool.  They were out on a street

1    corner.  And then he says, no, it was not a street corner

2    either.  It happens in a diner.

3           So you would think that if in fact Niranjan was in an

4    inside trading scheme with Brijesh that makes them net

5    $240,000, that results in $240,000 in profit, that he'd be able

6    to remember this.  I mean, people, you know the way memory

7    works:  You remember things that -- big events in your life.

8    But he doesn't.  He keeps changing his story, and we'll see

9    what story he tells on the stand.

10          Now, Niranjan has said, and we expect him to repeat,

11   that this inside trading scheme ends in 2018, the middle of

12   2018, pretty much when he moves to London.  He moves to London

13   for about a year.  So you might be thinking tell me how much

14   money, what is the evidence going to show about how much money

15   Brijesh receives.  And the answer is zero.  He does not receive

16   any of the money from these trades.

17          By the middle of 2018, there's $240,000 of profit net

18   from these alleged trades.  What that means -- and I want you

19   to keep this in mind for a little bit -- is that if we are to

20   believe Niranjan's story, by this time, the middle of 2018,

21   Brijesh is owed $120,000, that would be 50/50, which he says

22   was the agreement.  So let's keep that in mind because the

23   government said the eventual loan that is said to take place

24   two years later is about for $75,000, there is no way to

25   reconcile these two numbers.

1          Now, after Niranjan moves back to New York in 2019, I
2     should say there's a period of time where there's sort of
3     nothing happening, just life.  There's no allegations of any
4     wrongdoing.  The men remain friends.  They travel together
5     throughout Europe.  There's bachelor parties.  Their wives and
6     their group and everyone is getting together, and there's sort
7     of nothing happening.

8          However, in 2020 in connection, frankly with the
9     pandemic, the two men actually do have conversation.  They do
10     actually agree to engage in trading together.  This is legal
11     trading, lawful trading in big ticker stocks:  Lyft, Uber,
12     Moderna.  No one is going to suggest that there was anything
13     illegal or unlawful about this arrangement between Brijesh and
14     Akshay.  They were friends and they decided to do this.

15          Now, here is the thing.  In fairness, while certainly
16     not illegal at all, Brijesh trading in single stocks while he
17     was employed with Goldman Sachs was a violation of Goldman
18     Sachs policy.  And he did it.  And he engaged in conduct that
19     violated Goldman Sachs policies.  But not for very long, just
20     for three months.  It started in about October of 2020.  There
21     were some trades in November 2020, December, and then just a
22     little bit in January.

23          And what's so critical about this part of the story is
24     that when he starts trading, this legal trading in 2020 with
25     Niranjan, he sends Niranjan $12,000 so that Niranjan can put

1     some of these trades on Lyft, Moderna.  Let me say that again.

2     Brijesh sends Niranjan $12,000 so that Niranjan can put these

3     trades on.  Now remember, as of the middle of 2018, Niranjan

4     owed Brijesh, if we believe Niranjan, $120,000.  If we believe

5     Niranjan, they did an inside trading scheme, and each man gets

6     $120,000.  Brijesh never gets any money.  And then, what is it,

7     two years later Brijesh is sending the money to Niranjan.  Now

8     I guess he's owed $132,000 if we believe Niranjan.  We would

9     submit that the fact that Niranjan is accepting this money

10    suggest that his story is not accurate.  In fact, we think the

11    evidence is going to show that this $12,000 payment is evidence

12    that Brijesh didn't understand at the time that there was

13    $120,000 in trading profits or any money in trading profits in

14    this account.

15         So let's talk about 2021.  As I said, this legal

16    trading lasted two months.  And what happens in January 2021

17    Brijesh realize is I'm sort of doing this trading with

18    Niranjan, it's not big ticket stuff, the total profits are

19    several thousand dollars, but he realizes it is a violation.

20    He doesn't feel right about it, and so he exits this sort of

21    understanding.  And by the end of January he says, I'm out, and

22    there is evidence and there's text messages to show that as of

23    the end of January, middle, he's completely out of all trading

24    understandings with Niranjan.  So at this point, Niranjan --

25    I'm sorry, and what he says was when he's ending it is, you

N6CQgoe3                    Opening – Mr. Ford

1     know, I shouldn't, you know, the trading, I sort of don't want

2     any profits from it.  Let's just treat the $12,000 as a loan.

3     So that's sort of the understanding as we go into 2021, is that

4     actually Niranjan just owes Brijesh the $12,000.

5           A few months later, as I mentioned, Brijesh leaves

6     Goldman Sachs, moves to another financial institution, and he

7     becomes extremely busy and starts seeing less of Niranjan.

8     Also by the summer, Niranjan's life comes to be a bit

9     disordered.  He separates from his wife.  He actually moves in

10    with Brijesh and Natasha, is sleeping on their couch during his

11    separation.  He starts hanging out with people who are sort of

12    not a great influence.  He starts doing a lot of illicit drugs.

13    And in fact he winds up doing so much at a certain point he

14    winds up getting diagnosed with something called cannabis use

15    disorder and that sort of exacerbates another mental disorder

16    that he has that could impair cognitive function and memory.

17          Brijesh asks for his $12,000 back in the middle of

18    2021.  The men meet, and there is a discussion about a

19    repayment of the money, of the loan, and then Brijesh also asks

20    for a loan because they bought a house Upstate.  Brijesh and

21    Natasha bought a house Upstate and sort of overextended

22    themselves.  Now Niranjan doesn't know this, but Brijesh also

23    took out loans from other people, one other friend and a

24    commercial lender during this time because he needed a loan.

25          So he winds up receiving what's effectively $85,000 in

the summer of 2021. $12,000 was to repay the amount that he

had given him in the trading, and then $73,000 was the loan.

That's the $85,000. Now, again, this 85,000 doesn't connect

with any of the trading records and was just a loan. There's

nothing nefarious about it.

Let me talk about the recordings. You're going to

hear recordings in this case. There were two. Niranjan, while

he was attempting to cooperate, cooperating, he made two

recordings: One on June 5, one on June 10. The one on June 5

he stops halfway through. So only half the conversation is

recorded. The one on June 10 is about 45 minutes long. Both

of them are very, very hard to hear. I understand that we are

going to try and get you headphones to help. But they're going

to be hard to hear. They're also half in Hindi, but we are

going to try to listen to them, and I want you to listen to

them. The government is going to just play parts of them for

you, snippets. We think that you should again sort of reserve

judgment until you can hear the full context of these

recordings because in context, and if you listen to them, these

recordings are great for Brijesh. They prove, they're evidence

of his side of the story. So we would ask with these

recordings that you really listen to them.

Let me end on a final note. I get it's late, after

5:00. I apologize for that, but this is important.

I was trying to put myself in your shoes. Trying to

N6CQgoe3

1    think about how difficult it is for you, sitting there when you

2    get your jury duty notice.  You sit here all day.  It's 4:00

3    and now you have to hear two competing stories of, frankly,

4    dense, opaque material and to try and make sense of it.  And I

5    was thinking of how do we sort of think about this, and let you

6    know that we are going to get through it, and we are going to

7    get through it.

8           It happened to be last week when we had the wild fires

9    up in Canada.  And I'm sure everyone remembers the sky down

10   here was hazy and gray, and one day it was sort of that freaky

11   burnt orange.  You couldn't see anything.  That might be how

12   we're all feeling right now in terms of trying to figure out

13   what's going on here.

14          But like last week where we sat, we waited, took about

15   a week, right?  And then all of a sudden, we got back to our

16   nice New York City blue skies.  It's the same thing here.  Give

17   us about a week.  Everything might seem complicated and opaque,

18   but I can guarantee you in a week, the evidence is going to be

19   out.  Things are going to be clear.  The skies are going to be

20   blue again, and when they are, we hope that you all vote to

21   acquit Brijesh Goel.  Thank you.

22          THE COURT:  Thank you, Mr. Ford.

23          Ladies and gentlemen of the jury, it's been a long

24   day.  I want you to go home, put the case out of your mind.

25   Remember that you are not to discuss it with anyone, not to do

N6CQgoe3

1    any research of any kind, and we will be back tomorrow morning.

2              Now for tomorrow morning, what you want and I want is

3    getting a 10:00 sharp start with the testimony.  In order to

4    have a 10:00 start, you really have to be at the courthouse 20

5    to 10:00, quarter to 10:00 to go through security.  Otherwise

6    we can't have that 10:00 start.

7              And if we can get a full trial day in, that means that

8    we are that much further through the case.  This case is going

9    to be tried fairly and the parties are going to have the

10   opportunity to put on the evidence they want.  But to get that

11   done efficiently and get you back to your regular lives, a full

12   day would be appropriate.

13             So have a very pleasant evening.  Do not discuss the

14   case among yourselves or with anyone.  I will have some

15   preliminary instructions for you tomorrow morning.

16             Good night, ladies and gentlemen.  Please stand for

17   the jury.

18             Please exit through the jury room.  Thank you.

19             (Jury not present)

20             THE COURT:  Please be seated.  Tomorrow morning what I

21   propose to do is deliver the standard preliminary instructions

22   to the jury on such things on what is and is not evidence, the

23   presumption of innocence, the government's burden and

24   credibility of witnesses.  And I thought it was appropriate to

25   add the following instruction:

N6CQgoe3

|     |     |
| --- | --- |
| 1 | Ladies and gentlemen, there is no legal requirement |
| 2 | that law enforcement agents investigate crimes in a particular |
| 3 | way or that the government prove its case through any |
| 4 | particular means.  While you are to carefully consider the |
| 5 | evidence introduced by the evidence, you are not to speculate |
| 6 | as to why the government used the techniques they did or why |
| 7 | they did not use other techniques.  The government is not on |
| 8 | trial.  Law enforcement techniques are not your concern.  Your |
| 9 | concern is to determine whether on the evidence, or lack of |
| 10 | evidence, the defendant's guilt has been proven beyond a |
| 11 | reasonable doubt. |
| 12 | Any objection from the government? |
| 13 | MR. THOMAS:  No, your Honor.  That sounds like an |
| 14 | accurate recitation of the law. |
| 15 | THE COURT:  Any objection from the defendant? |
| 16 | MR. FORD:  No, your Honor. |
| 17 | THE COURT:  Thank you all very much.  Have a very |
| 18 | pleasant evening.  And I'll see you all tomorrow morning. |
| 19 | Thank you. |
| 20 | (Adjourned to June 13, 2023, at 10:00 a.m.) |
| 21 | * * * |
| 22 | |
| 23 | |
| 24 | |
| 25 | |